UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIOLETA GRIGORESCU,<br><br>             Plaintiff,<br><br>        v.<br><br>BOARD OF TRUSTEES OF THE SAN MATEO COUNTY COMMUNITY COLLEGE DISTRICT, et al.,<br><br>             Defendants. | Case No. 18-cv-05932-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 14 |

Plaintiff Violeta Grigorescu has filed suit against the San Mateo Community College District ("District") and several of its employees, namely, Eugene Whitlock, Charlene Frontiera, and Harry Joel (collectively "Defendants"). Ms. Grigorescu asserts violations of both federal and state law, including 42 U.S.C. §§ 1983 and 1981, Title VII, and the California Fair Employment and Housing Act ("FEHA"). Currently pending before the Court is Defendants' motion to dismiss the first amended complaint ("FAC"). Docket No. 14 ("Mot."). Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court **GRANTS** Defendants' motion to dismiss, but gives Ms. Grigorescu leave to amend.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

In the FAC, Ms. Grigorescu alleges as follows.[1] In 2004, Ms. Grigorescu started to work

---

[1] The majority of the allegations below come from Ms. Grigorescu's FAC. However, because the FAC is not always a model of clarity, to give Ms. Grigorescu the benefit of the doubt, the Court has also included some allegations that Ms. Grigorescu made in pleadings that she filed in a related state court action. The Court may take judicial notice of the state court pleadings. *See e.g., United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (stating that "we may take notice of proceedings in other courts, both within and

for the District as a lab tech at the College of San Mateo ("CSM").  In 2008, she was hired as a faculty member at CSM.  More specifically, she worked as a part-time (adjunct) physics professor. *See* FAC ¶¶ 1, 22.

Starting in 2011, Ms. Grigorescu began to experience problems with her employment by the District.  *See* FAC ¶ 4.  In particular, she "lost favor with Defendants when she organized a group called Friends of CSM Gardens."  FAC ¶ 24.  Friends "opposed conversion of [a] 50-year old open space known as the Garden into a parking lot."  FAC ¶ 24.  Ms. Grigorescu "organized students, contacted political figures, and advised members of the CSM Garden Club to attend campaign events of the President of the District's Board of Trustees, who was running for a position on the San Mateo County Board of Supervisors[,] and [to] raise questions about support for converting the Garden into a parking lot."  FAC ¶ 24.

In September 2011, Friends filed a lawsuit against, *inter alia*, the District in state court. *See Friends of the Coll. of San Mateo Gardens v. San Mateo County Cmty. Coll. Dist.*, No. CIV 508656 (Cal. Super. Ct.).  In the lawsuit, Friends argued that the District's decision to demolish, *inter alia*, the Garden without preparing an environmental impact report violated the California Environmental Quality Act.  In June 2012, the state trial court issued a decision in favor of Friends.  *See Friends of the College of San Mateo Gardens v. San Mateo County Cmty. Coll. Dist.*, No. CIV 508656, 2012 Cal. Super. LEXIS 11934 (Cal. Super. Ct. June 6, 2012).  In September 2013, the intermediate appellate court affirmed the lower court's judgment.  *See Friends of the Coll. of San Mateo Gardens v. San Mateo County Cmty. Coll. Dist.*, No. A135892 (Cal. App. Ct.). Subsequently, in September 2016, the California Supreme Court reversed the judgment of the intermediate appellate court and remanded for further proceedings.  *See Friends of the Coll. of San Mateo Gardens v. San Mateo County Cmty. Coll. Dist.*, No. S214061 (Cal. Sup. Ct.).  In May 2017 – on remand from the California Supreme Court – the intermediate appellate court again found in favor of Friends and affirmed the judgment.  *See Friends of the Coll. of San Mateo*

_____

without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *see also United States v. Wilson*, 631 F.2d 118 (9th Cir. 1980) (stating that a court may take judicial notice of court records in another case).

2

*Gardens v. San Mateo County Cmty. Coll. Dist.*, No. A135892 (Cal. App. Ct.).[2]

At or about the time that Friends first initiated the state environmental lawsuit in 2011, Ms. Grigorescu began to have medical problems which required treatment. *See, e.g.*, FAC ¶¶ 27, 32. The District, Mr. Joel (Vice Chancellor of Human Resources for the District), and/or Ms. Frontiera (Dean of the District's Math and Science Division) were resistant to her returning to work and made efforts to prevent her return. *See* FAC ¶ 27 *et seq.* In August 2011, after Ms. Grigorescu's union intervened, she was allowed to resume her position as a part-time adjunct professor. However, in 2013, Ms. Grigorescu began to have different medical problems which required treatment, and Defendants again made efforts to bar Ms. Grigorescu from working for the District. *See* FAC ¶ 34. Eventually, in January 2014, the District allowed Ms. Grigorescu to return to work as a lab tech but gave the physics class that Ms. Grigorescu was scheduled to teach "to an instructor with less seniority." FAC ¶ 39.

In July 2014, Mr. Joel retired, and Mr. Whitlock replaced him as Vice Chancellor of Human Resources. Mr. Whitlock, an attorney, had advised and represented the District in the state environmental lawsuit that Friends filed against, *inter alia*, the District. *See* FAC ¶ 40.

In October 2014, a full-time position for a physics teacher opened up. *See* FAC ¶ 42. In March 2015, Ms. Grigorescu (then only a part-time (adjunct) physics teacher) applied for the position. *See* FAC ¶ 43. "Within days[,] [Mr.] Whitlock removed [her] from the applicant pool," claiming that she "did not have the qualifications required." FAC ¶ 43. Mr. Whitlock told Ms. Grigorescu that he had "conducted a Google search regarding degrees she received in Romania" and "his Google search showed the master's degree she received in Romania was only equivalent to a bachelor's degree." FAC ¶ 44. Mr. Whitlock accused Ms. Grigorescu of "dishonesty and . . . misrepresenting her educational credentials." FAC ¶ 44.

Ms. Grigorescu disputed Mr. Whitlock's claims. *See* FAC ¶ 45. After her union and the District academic senate intervened on her behalf, Mr. Whitlock stated that he would allow Ms.

---

[2] In the FAC, Ms. Grigorescu makes some slightly different factual allegations about the state environmental lawsuit. *See, e.g.*, FAC ¶¶ 25, 27. However, the Court takes judicial notice of state court documents that reflect the above history.

Grigorescu to be a part of the applicant pool and also to resume teaching as a part-time (adjunct) physics teacher, but only provided that she "go through a new process of requesting equivalency from a newly formed or created faculty qualifications committee." FAC ¶ 47. The stress on Ms. Grigorescu led to more medical problems that the District, Mr. Whitlock, and/or Ms. Frontiera refused to accommodate. *See* FAC ¶ 50. In April 2015, Ms. Grigorescu "reluctantly" agreed to a new process of requesting equivalency, after which she was allowed to re-enter the applicant pool for the full-time physics teaching position. FAC ¶¶ 51-52.

The day after signing the equivalency form, Ms. Grigorescu interviewed for the position, but she was not allowed to do a classroom demonstration and Ms. Frontiera caused Ms. Grigorescu "to break[]down and cry in front of the interviewing committee." FAC ¶ 53. Within a few days after the interview, Ms. Grigorescu was told that "she was not selected to advance in the recruitment process." FAC ¶ 54.

In May 2015, the District, Mr. Whitlock, and/or Ms. Frontiera purported to discuss medical accommodations with Ms. Grigorescu but ultimately concluded that she could not perform her job duties as an adjunct professor. *See* FAC ¶ 55 *et seq.*

After Ms. Grigorescu signed the equivalency forms, Mr. Whitlock continued investigating Ms. Grigorescu's Romanian degrees in May 2015. *See* FAC ¶ 58. In June 2015, Mr. Whitlock informed Ms. Grigorescu that he was recommending her suspension and termination on the ground that she had "falsely claimed she had a master's degree and the equivalency of a minor in mathematics" and that she had misrepresented "her Diploma de Baccalaureate as a Bachelor's degree credential in an informal conversation with another employee." FAC ¶ 60; *see also* Defs.' RJN, Ex. 1 (State Court Pet. ¶ 10).

In June 2015, a Skelly hearing was held before a District employee, Mike Claire, who upheld the proposed suspension and termination. *See* Defs.' RJN, Ex. 1 (State Court Pet. ¶ 11). A Skelly hearing is a pre-termination hearing for a public employee, in which the employer must provide, at minimum, "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." *Skelly v. State Pers. Bd.*, 15 Cal. 3d 194, 215

1  (1975).

2       In July 2015, an administrative hearing followed the Skelly hearing. This hearing was

3  conducted before Kathryn E. Meola, "a Chief Deputy County Counsel for San Mateo County."

4  Defs.' RJN, Ex. 1 (State Court Pet. ¶ 12). In August 2015, Ms. Meola issued her written findings

5  and recommendations, stating in relevant part as follows: "I find and recommend that, while there

6  is some evidence that would support the imposition of discipline on [Ms. Grigorescu] for

7  misrepresentation of her academic qualifications, there is insufficient cause to terminate her

8  employment." Defs.' RJN, Ex. 1 (State Court Pet., Ex. 1) (Meola Decision at 2). Ms. Meola

9  elaborated: "I find that the District did not meet its burden to establish that [Ms. Grigorescu] has

10  engaged in dishonesty or falsified information supplied to the District in [her] claims that she

11  obtained the equivalent to a master's degree from the University of Bucharest." Defs.' RJN, Ex. 1

12  (State Court Pet., Ex. 1) (Meola Decision at 2-3). However,

> 13  the District did establish, by a preponderance of the evidence, that
> [Ms. Grigorescu] engaged in a pattern of dishonesty by
> 14  misrepresenting that [she] possessed a minor in mathematics, and in
> her claim to David Feune that her Diploma de Baccalaureate was a
> 15  bachelor's degree, but that, owing to its relatively minor nature and
> the lack of progressive discipline to date, this dishonesty does not, in
> 16  my opinion, support termination of [her] employment.

17  Defs.' RJN, Ex. 1 (State Court Pet., Ex. 1) (Meola Decision at 3).

18       In October 2015, the Board adopted Ms. Meola's findings and recommendations and

19  reinstated Ms. Grigorescu to active, paid employment. *See* Defs.' RJN, Ex. 1 (State Court Pet. ¶

20  12 & Ex. 2) (Board Final Decision at 1-2). The Board, however, only allowed Ms. Grigorescu to

21  resume her job as a lab tech, and not as a part-time (adjunct) physics teacher. *See* FAC ¶ 62.

22       In December 2015, Ms. Grigorescu filed a complaint with the California Department of

23  Fair Employment and Housing ("DFEH") against the District. In her complaint, Ms. Grigorescu

24  asserted that she had been subjected to "a continuous course of misconduct and illegal actions,"

25  including "false charges of dishonesty," "biased job disciplinary actions including suspension

26  without cause," "discriminatory termination of . . . part time employment as an adjunct physics

27  instructor," and "failure to hire . . . for an open full time position." Defs.' RJN, Ex. 2 (State Court

28  First Am. Pet., Ex. 1) (DFEH Compl. at 6). Ms. Grigorescu maintained that Mr. Whitlock and

Ms. Frontiera had personal animosity against her and that the adverse employment actions were also motivated by "intentional disability discrimination." Defs.' RJN, Ex. 2 (State Court First Am. Pet., Ex. 1) (DFEH Compl. at 6).

Subsequently, after receiving her right-to-sue notice, Ms. Grigorescu filed a lawsuit in state court against the District. *See* Defs.' RJN, Ex. 1 (State Court Pet.). The action was a petition for a writ of administrative mandamus pursuant to California Code of Civil Procedure § 1094.5 and/or a writ of mandamus pursuant to § 1085. In her petition, Ms. Grigorescu claimed that,

> [b]eginning in June[] 2011 and continuing until the present time, various agents of [the District] have engaged in a continuous pattern of discriminatory and retaliatory conduct towards [her], aimed at coercing her to resign, then terminating her employment in both jobs, by (a) failing to accommodate her temporary physical disability; (b) suspending her employment without pay based on false accusations of dishonesty; (c) refusing to hire her as a part time instructor until the present time in violation of FEHA; and (d) erroneously finding [her] ineligible for a full time tenure track physics instructor position for pretextual reasons.

Defs.' RJN, Ex. 1 (State Court Pet. ¶ 3). The bulk of the petition was devoted to allegations related to disability discrimination and/or failure to accommodate. *See, e.g.*, Defs.' RJN, Ex. 1 (State Court Pet. ¶ 15).

After filing the state court action, Ms. Grigorescu continued to have problems with her employment – *e.g.*, there were continued failures to accommodate by the District, Mr. Whitlock, and/or Ms. Frontiera. *See* FAC ¶¶ 66, 69. The mistreatment caused Ms. Grigorescu to have further medical problems. *See* FAC ¶ 71.

In March 2016, Ms. Grigorescu was told of the District's intent to suspend and terminate her from her lab tech position. *See* Defs.' RJN, Ex. 2 (State Court First Am. Pet. ¶ 22). This prompted Ms. Grigorescu to file an amended petition and complaint in the state court action. In this pleading, Ms. Grigorescu not only sought a mandamus writ as relief but also asserted multiple causes of action for employment discrimination – most centered on disability discrimination and/or failure to accommodate. *See* Defs.' RJN, Ex. 2 (State Court First Am. Pet.). (Ms. Grigorescu subsequently filed additional amended pleadings in state court. *See* Defs.' RJN, Exs. 4-6 (amended pleadings filed in June 2016, October 2016, and May 2017).)

In April 2016, Ms. Grigorescu was again informed of the proposed termination. *See* FAC ¶ 75. Thereafter, in June and July 2016, a *Skelly* hearing "was held before a hearing officer selected by the District." FAC ¶ 77. In November 2016, the *Skelly* hearing officer recommended termination of Ms. Grigorescu's employment "due to prior discipline: [her] alleged misrepresentation of her math minor, and [her] alleged misrepresentation of her Baccalaureate high school diploma." FAC ¶ 78. There are no allegations that an administrative hearing followed the *Skelly* hearing. In January 2017, Ms. Grigorescu's employment as a lab tech was finally terminated. *See* FAC ¶ 79.

In February 2018, Ms. Grigorescu filed a new complaint with the DFEH, alleging that, in January 2017, she was subject to retaliation and discrimination on the basis of sex, national origin, age, and disability. *See* Defs.' RJN, Ex. 8 (DFEH complaint).

In May 2018, the state court issued a tentative ruling on Ms. Grigorescu's writ petition. More specifically, it denied the petition on the following ground: "Despite a Court-approved briefing schedule, the administrative record has not been lodged and no points and authorities or moving papers have been filed supporting the application for Writ." Defs.' RJN, Ex. 7 (tentative ruling). It appears that, since the tentative ruling, there has been no other filings in the state court action or hearings scheduled. The case is still marked "Active," and the court has not ruled on the employment discrimination causes of action asserted in the operative amended complaint.

In September 2018, after receiving a notice of right to sue, *see* FAC ¶ 21 (alleging a notice of right to sue was issued by the Deputy Attorney General of the United States Department of Justice, Civil Rights Division, in July 2018), Ms. Grigorescu filed the instant action in federal court. Ms. Grigorescu subsequently filed a FAC, which asserts the following claims for relief.

> (1) 42 U.S.C. § 1983: Defendants retaliated against Ms. Grigorescu for exercising her First Amendment rights through her activism with Friends.
>
> (2) 42 U.S.C. § 1981: Defendants harassed Ms. Grigorescu, failed to promote, and ultimately terminated her employment because of her race and national origin.
>
> (3) Title VII: Defendants terminated Ms. Grigorescu's employment because of her race or national origin, age, and gender, and retaliated against her because she

engaged in protected activity.

(4) FEHA: Defendants harassed Ms. Grigorescu's because of her race or national origin, terminated her employment because of her race or national origin and gender, discriminated against her because of her age, and failed to prevent discrimination.

(5) Intentional infliction of emotional distress ("IIED"): Defendants' actions caused Ms. Grigorescu to experience severe emotional distress.

(6) Violation of public policy: Defendants' failure to promote, discriminatory termination, and tortious conduct violates public policy under California law.

## II.    DISCUSSION

A.    Legal Standard

For a plaintiff to survive a Rule 12(b)(6) motion to dismiss after *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), her factual allegations "must . . . suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014). In other words, the complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'" *Id.*

The Ninth Circuit has outlined a two-step process for evaluating pleadings against this standard.

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt*, 765 F.3d at 1135.

B.    *Colorado River* Abstention

As an initial matter, the Court addresses Defendants' contention that the Court should altogether refuse to entertain Ms. Grigorescu's lawsuit based on *Colorado River* abstention. Under *Colorado River*, a district court may decline to "exercise federal jurisdiction, in deference to pending, parallel state proceedings" when such a decision is justified by considerations "of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Montanore Minerals Corp. v. Bakie*, 867 F.3d 1160, 1165–66 (9th Cir. 2017). In the instant case, the pending parallel state court action is the state court lawsuit that Ms. Grigorescu filed in December 2015. As noted above, that case still appears to be "Active" because, although the petition for a mandamus writ appears to have been denied, no rulings have been made on the causes of action for employment discrimination pled in the operative amended complaint.

The Supreme Court has emphasized that the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," and the "pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). In exceptional circumstances, however, a federal court may decline to exercise federal jurisdiction where "the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* at 813.

The Ninth Circuit has articulated a balancing test that considers the following eight factors:

> (1) which court first assumed jurisdiction over any property at stake;
> (2) the inconvenience of the federal forum; (3) the desire to avoid
> piecemeal litigation; (4) the order in which the forums obtained
> jurisdiction; (5) whether federal law or state law provides the rule of
> decision on the merits; (6) whether the state court proceedings can
> adequately protect the rights of the federal litigants; (7) the desire to
> avoid forum shopping; and (8) whether the state court proceedings
> will resolve all issues before the federal court.

*R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 978 (9th Cir. 2011). However, these factors should not be evaluated as a "mechanical checklist" and "[a]ny doubt as to whether a factor exists

should be resolved against a stay or dismissal." *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 842 (9th Cir. 2017).

The Court rejects Defendants' contention that the Court should abstain from adjudicating the merits of Ms. Grigorescu's case based on *Colorado River*. Defendants fail to allege that there are exceptional circumstances in this case warranting abstention. Furthermore, even if they had made such an assertion, it would be unpersuasive. This case concerns conventional employment discrimination and retaliation claims that this Court routinely decides and does not implicate any exceptional circumstances that necessitate staying or dismissing this case. Moreover, there is no property at stake, the federal forum is not inconvenient, the parties have not expended effort litigating the substance of the case in state court, and the factual and legal allegations in the instant case differ from those raised in state court.

Finally, because the case at bar raises federal claims not advanced in state court, there is a possibility that the state court proceeding will not resolve all issues before this Court.

Accordingly, the Court declines to issue a stay or dismissal under the *Colorado River* doctrine and will exercise its jurisdiction.

## C.    Res Judicata and Collateral Estoppel

Defendants argue that, even if the Court does not abstain under *Colorado River*, the bulk of Ms. Grigorescu's claims (*i.e.*, the § 1983, § 1981, Title VII, and FEHA claims) are subject to preclusion. *See* Mot. at 25. According to Defendants, there is preclusion based on (1) the state court action described above and (2) administrative proceedings that Ms. Grigorescu initiated. Defendants invoke the typical preclusion doctrines of res judicata and collateral estoppel and also refer to a related doctrine of exhaustion of judicial remedies.

### 1.    State Court Judgment

A federal court must give a state court judgment the same preclusive effect that it would have in the courts of the state in which it was rendered, even on claims within exclusive federal jurisdiction. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 369 (1996); *see also Dodd v. Hood River Cty.*, 136 F.3d 1219, 1225 (9th Cir. 1998).

Under California law, res judicata "prevents relitigation of the same cause of action in a

second suit between the same parties or parties in privity with them." *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002). Claim preclusion arises if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. *See id.* Even if a party does not raise the same exact claims in the initial suit, those claims are still barred in the second suit if the party could have raised them in the first suit but opted not to. In order words, res judicata

> not only precludes relitigation of claims resolved in a prior action, but it also precludes litigation of claims that could have been brought in the prior action but were not. As [the California] Supreme Court has stated, "The law abhors a multiplicity of actions . . . . [A] party cannot by negligence or design withhold issues and litigate them in successive actions; he may not split his demands or defenses; he may not submit his case in piecemeal fashion."

*Franceschi v. Franchise Tax Bd.*, 1 Cal. App. 5th 247, 258 (2016).

While res judicata deals with claim preclusion, collateral estoppel concerns issue preclusion. For collateral estoppel to apply, the following requirements must be satisfied:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990).

Notably, both res judicata and collateral estoppel require not a final judgment on the merits. A dismissal for procedural reasons, including failure to prosecute, is not considered a final judgment on the merits for either res judicata or collateral estoppel purposes. *See Hardy v. Am.'s Best Home Loans*, 232 Cal. App. 4th 795, 803 (2014) (citing *Lord v. Garland*, 27 Cal. 2d 840, 850 (1946)). Moreover, "when a case is dismissed without evidence having been offered it is error to render judgment on the merits." *Id.*; *see also Mattern v. Carberry*, 186 Cal. App. 2d 570, 572 (1960) (holding that dismissal for lack of prosecution was not a judgment on the merits).

In the instant case, Defendants cannot rely on the state court action filed by Ms. Grigorescu for res judicata or collateral estoppel precisely because that action has not yet reached a final

judgment, let alone one on the merits. As noted above, the state court case is still marked "Active" and, although the mandamus petition appears to have been denied, no rulings have been made on the employment discrimination causes of action pled in the operative amended complaint. Moreover, even if the state court's denial of the mandamus petition were deemed to be a final judgment, it is not a final judgment on the merits. The denial of the mandamus petition was based on the failure to lodge an administrative records and briefs.

### 2. Administrative Proceedings

As noted above, Ms. Grigorescu has referenced in her FAC or in her pleadings in the state court action two administrative proceedings – one that culminated in October 2015 when the District Board reinstated Ms. Grigorescu to active, paid employment (at least for the lab tech job) and one that culminated in January 2017 when Ms. Grigorescu was terminated from her lab tech position. It is not clear from Defendants' papers which administrative proceedings they are relying on for res judicata and collateral estoppel – and, for collateral estoppel specifically, which exact issues are purportedly barred from relitigation. Nevertheless, putting this problem aside, the Court holds that, at least at this juncture in the proceedings, dismissal based on preclusion is not appropriate.

To have preclusive effect in federal court, state administrative determinations must satisfy: (1) the state requirements for preclusion and (2) the requirements of fairness set out in *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966). *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986); *see also Misischia v. Pirie*, 60 F.3d 626, 629 (9th Cir. 1995). The *Utah Construction* requirements are: "(1) that the administrative agency act in a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that the parties have an adequate opportunity to litigate." *Utah Constr.*, 384 U.S. at 422. This rule applies when analyzing both the res judicata and collateral estoppel effect of administrative proceedings.[3]

---

[3] The *Utah Construction* fairness requirements also apply to the doctrine of exhaustion of judicial remedies, which the California Supreme Court identified in *Johnson v. City of Loma Linda*, 24 Cal. 4th 61 (2000). *See Johnson*, 24 Cal. 4th at 76 (holding that an administrative finding is binding on subsequent FEHA claims when an employee pursues administrative remedies, receives an adverse finding, and fails to have the finding set aside through a successful mandate action in superior court). The Court notes that it is not clear from California case law whether the doctrine

*See Elliott*, 478 U.S. at 797-99.  The California Supreme Court, which has adopted the *Utah Construction* fairness requirements, has elaborated on when the requirements have been met.  *See Pacific Lumber Co. v. State Water Resources Control Bd.*, 37 Cal. 4th 921, 944 (2006).  "Indicia of [administrative] proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision."  *Id.*

In the instant case, Defendants ask for the Court to apply res judicata and collateral estoppel even though there is no factual record as to whether the *Utah Construction* fairness requirements have been met in the relevant administrative proceeding(s).  Without such a record, Defendants' request cannot be granted.  Indeed, in a 12(b)(6) motion to dismiss, the court is generally confined to the four corners of the complaint, and the allegations in Ms. Grigorescu's FAC indicate that, at least for the January 2017 termination, the only administrative proceeding was an advisory Skelly hearing which, as generally understood under California law, does not meet the *Utah Construction* fairness requirements.  *See Skelly*, 15 Cal. 3d at 215 (articulating the minimum requirements for a pre-termination hearing for a public employee: "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline").

D.    <u>District</u>

Defendants assert that, even if the Court does not apply preclusion at this juncture of the

---

of judicial exhaustion is separate from the doctrine of collateral estoppel or whether the former, in effect, falls within the rubric of the latter.  *See id.* at 78 (Werdegar, J., concurring) (noting "[r]ather than rely on a requirement of exhaustion of judicial remedies, I would rest our decision on the collateral estoppel effect of a final administrative finding made in a quasi-judicial proceeding"); *Knickerbocker v. City of Stockton*, 199 Cal. App. 3d 235, 241 (Ct. App. 1988) (noting "the underpinnings of this rule of exhaustion of judicial remedies…are buried in the doctrine of res judicata or that portion of it known as collateral estoppel…").  For purposes of this opinion, however, the Court need not resolve the issue as it is clear that, whichever is true, the doctrine of judicial exhaustion cannot apply if the *Utah Construction* fairness requirements have not been met.

1    proceedings, at the very least, the bulk of the claims against the District should be dismissed

2    pursuant to Eleventh Amendment immunity.  "Under the eleventh amendment, agencies of the

3    state are immune from private damage actions or suits for injunctive relief brought in federal

4    court." *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).

5        The Court agrees that the District is an arm of the state entitled to sovereign immunity.  In

6    *Mitchell*, the Ninth Circuit held that a school district comparable to the District had Eleventh

7    Amendment immunity from suit.  *See id.* at 201 (noting that "California state colleges and

8    universities are 'dependent instrumentalities of the state'").  Ms. Grigorescu acknowledges the

9    holding in *Mitchell* but argues that the holding is in error.  *See* Docket No. 15, Plaintiff's

10   Opposition to Defendant's Motion to Dismiss, ("Opp.") at 6 (asserting that, if the Ninth Circuit

11   had evaluated the factors it identified in *Mitchell*, "it would have reached a different conclusion").

12   Nevertheless, *Mitchell* is binding precedent on this Court, and the Court therefore finds that

13   Eleventh Amendment immunity is generally applicable.

14       The Court therefore dismisses all claims against the District with prejudice, except for the

15   Title VII claims.  The District is not immune from Title VII claims because California's sovereign

16   immunity has been abrogated by Title VII.  *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 454 (1976)

17   (holding that Congress has abrogated Eleventh Amendment immunity with respect to Title VII

18   claims); *Cerrato v. San Francisco Cmty. Coll. Dist.,* 26 F.3d 968, 976 (9th Cir. 1994) (noting the

19   same).  However, for all other claims, Eleventh Amendment immunity applies.  *See, e.g.*, *Mitchell*

20   *v. Los Angeles Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) ("hold[ing] that, under

21   California law, the district is a state entity that possesses eleventh amendment immunity from the

22   appellant's section 1981, 1983 and 1985 claims in damages and for injunctive relief"); *Freeman v.

23   Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (holding that the Eleventh

24   Amendment barred plaintiff's FEHA claim); *Torres v. State Bar of Cal.*, 143 F. App'x 13, 14 (9th

25   Cir. 2005) (affirming dismissal of California state law claims under the Eleventh Amendment,

26   including IIED claims).

27   E.    Mr. Joel

28       Defendants argue next that all claims asserted against Mr. Joel (who was the Vice

14

United States District Court
Northern District of California

1    Chancellor of Human Resources for a time) should be dismissed because of the statute of

2    limitations. They also argue that Mr. Joel was no longer employed by the District at the time of

3    the relevant (alleged) adverse employment actions taken against Ms. Grigorescu. In response, Ms.

4    Grigorescu has stated that she will dismiss Mr. Joel from the lawsuit. *See* Docket No. 20 (Joint

5    CMC St. at 10). Accordingly, all claims against Mr. Joel are dismissed with prejudice.

6    F.    Section 1983 Claim

7           Based on the Court's rulings above (dismissing the District and Mr. Joel), the § 1983 claim

8    is potentially viable against Mr. Whitlock and Ms. Frontiera only. The gist of the § 1983 claim is

9    that these defendants allegedly retaliated against her for her participation in the environmental

10   lawsuit (*i.e.*, the action filed by Friends to prevent the Garden from being converted into a parking

11   lot).

12          As an initial matter, the Court finds that there are insufficient allegations to support any

13   retaliation by Ms. Frontiera. There are no allegations that Ms. Frontiera was ever aware of the

14   environmental lawsuit and that, even if she was, her actions against Ms. Grigorescu were

15   connected in any way to Ms. Grigorescu's involvement in the lawsuit. As to Mr. Whitlock, Ms.

16   Grigorescu intimates that it is a reasonable inference that he took adverse employment actions

17   against her (*e.g.*, challenging her academic credentials) based on her participation in the

18   environmental lawsuit because he was a lawyer that represented the District in the lawsuit. But

19   *Iqbal* and *Twombly* require plausibility, not just possibility. There are insufficient allegations or

20   reasonable inferences drawn therefrom showing that Ms. Grigorescu's protected speech/activity

21   "was a substantial or motivating factor" behind Mr. Whitlock's actions. *Eng v. Cooley*, 552 F.3d

22   1062, 1070 (9th Cir. 2009).

23          The Court acknowledges that, in some cases, temporal proximity between the protected

24   speech/activity and the adverse employment action is enough to support the requisite causal

25   connection; but, in such cases, "the temporal proximity must be very close." *Clark Cty. Sch. Dist.*

26   *v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing cases indicating a three-month period is

27   insufficient and holding that a twenty-month period is insufficient). In the instant case, Mr.

28   Whitlock did not initiate any adverse action against Ms. Grigorescu until four years after she

15

engaged in protected activity in 2011.  *See* FAC ¶ 43 (alleging that Mr. Whitlock removed her from the applicant pool for the full-time physics teacher position in March 2015).  While it is true that Mr. Whitlock did not become Vice Chancellor of Human Resources until 2014, there is no allegation that he participated or supported any adverse action against Ms. Grigorescu during the three years between 2011 and 2014.

The Court therefore dismisses the § 1983 claim against both Ms. Frontiera and Mr. Whitlock but shall give Ms. Grigorescu leave to amend, if she can do so in good faith and in compliance with her Rule 11 obligations.

G.    Section 1981 Claims

Similar to above, based on the Court's rulings on Eleventh Amendment immunity and Mr. Joel, the § 1981 claims are potentially viable against only Mr. Whitlock and Ms. Frontiera.  The thrust of the § 1983 claims is that these individuals harassed Ms. Grigorescu, failed to promote, and ultimately terminated her employment because of her race and national origin.

1.    Race v. National Origin

As a preliminary matter, Defendants argue that Ms. Grigorescu's § 1981 claims should be dismissed in their entirety because § 1981 prohibits only race discrimination, not national origin discrimination, and, at best, Ms. Grigorescu has implicated only national origin discrimination as her § 1981 claims are based on her Romanian descent.

Although § 1981 "does not itself use the word "race," the Court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts."  *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987).  The Ninth Circuit has made clear that "national origin discrimination is not within the ambit of § 1981."  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004).  That being said, the Ninth Circuit has also stated that, under § 1981, "race has been defined broadly to cover immigrant ethnic groups."  *Id.* (finding a genuine dispute of material fact as to whether plaintiff was discriminated against in violation of § 1981 "because he is Hispanic"); *see also Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (stating that, "when Congress enacted § 1981, it intended 'race' to be defined broadly, to cover discrimination against ethnic groups such as the Chinese").

Moreover, the Supreme Court has stated:

> "Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory."

*Al-Khazraji*, 481 U.S. at 613. Defendants have not cited any authority to support the proposition that Romanians or similar groups are not an ethnic group cognizable under §1981. The Court therefore turns to Defendants' other arguments in support of dismissal of the § 1981 claims.

### 2.    Disparate Treatment: Failure to Promote and Termination

In addition to asserting harassment based on her Romanian descent, Ms. Grigorescu contends disparate treatment based on her Romanian descent. More specifically, she maintains that she was not hired as a full-time instructor and was ultimately discharged because she is Romanian. When evaluating § 1981 claims of this nature, a court's analysis may be guided by the *McDonnell Douglas* framework. *See Stones v. Los Angeles Cmty. Coll. Dist.*, 572 F. Supp. 1072, 1079 (C.D. Cal. 1983), *aff'd*, 796 F.2d 270 (9th Cir. 1986). Under *McDonnell Douglas*, there is a prima facie case of discrimination where a plaintiff shows that "(1) [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably." *Nicholson v. Hyannis Air Service*, 580 F.3d 1116, 1123 (9th Cir. 2009).

Ms. Grigorescu argues that she has established a prima facie case of discrimination in the instant case because she has alleged that she was not promoted for the full-time position and instead "Defendants selected a male who is not of Romanian descent and whose qualifications and experience were as good as Plaintiff's to fill the position." FAC ¶ 100. She also alleges that after her termination "Defendants selected a person or persons of a different race and/or national origin than Plaintiff's." FAC ¶ 104. Both allegations, however, are too conclusory; Ms. Grigorescu has alleged no facts that demonstrate that the candidate who replaced her was in fact similarly situated – *e.g.*, had similar qualifications and experience. Ms. Grigorescu has also alleged no facts demonstrating that Defendants subjected her to stricter credential equivalency requirements

United States District Court
Northern District of California

relative to other similarly situated individuals. Nor has she alleged any evidence of anti-Romanian animus on the part of Defendants.

Accordingly, the motion to dismiss the disparate treatment claims is granted, but Ms. Grigorescu has leave to amend to demonstrate that other similarly situated candidates were treated more favorably.

### 3. Harassment

Although not entirely clear, it appears that Ms. Grigorescu's claim of harassment is predicated on allegations that she was not hired for the full-time physics teaching position, that she was suspended and terminated, and that her academic credentials were challenged, all because of her Romanian descent.

To demonstrate race-based harassment, a plaintiff must show: "(1) that she was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 686 (9th Cir. 2017).

There is no specific allegation establishing she was subject to harassment of a racial nature simply because the academic credentials were scrutinized – there is no allegation, for instance, that those credentials were scrutinized because she is Romanian. Moreover, Ms. Grigorescu has failed to plead sufficient facts in support of the third element, namely, that the conduct was "sufficiently severe or pervasive." *Id.* This standard is not easily met. Courts have held that a hostile work environment does not exist even when presented with conduct much more serious than what Ms. Grigorescu has alleged here. For example, in *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990), the Ninth Circuit affirmed a directed verdict in favor of defendants, holding that no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino. *Id.* at 1031, 1036. If the facts in *Sanchez* are not sufficiently severe or pervasive, Ms. Grigorescu's allegations that

Defendant questioned her academic credentials surely does not rise to that level. A comparison with other cases confirm this conclusion. For instance, in *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005), the court held that the district court properly denied motion for judgment as a matter of law where defendant referred to plaintiff as "Manny" rather than Mamdouh for almost a year, despite plaintiff's repeated objections. *See id.* at 1073-74. *El-Hakem* is distinguishable because the conduct was pervasive; it occurred repeatedly for almost a year. In *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116 (9th Cir. 2008), the court refused to dismiss the case where a nurse repeatedly requested that an African American plaintiff remove trash from an operating room, "which she viewed as funny." *Johnson* is distinguishable because two other allegations contributed to the totality of the circumstances, including a coworker using racial epithets and making threatening movements, as well as racially discriminatory conduct aimed at individuals other than the plaintiff. *See id.* at 1123-24.

Accordingly, the Court grants the motion to dismiss the harassment claims under § 1981, but gives Ms. Grigorescu leave to amend to plead additional factual allegations to support the "severe or pervasive" requirement.

H.    Title VII and FEHA Claims

The defendants for the Title VII claims are the District, Mr. Whitlock, and Ms. Frontiera. In contrast, for the FEHA claims, the only remaining defendants are Mr. Whitlock and Ms. Frontiera. Putting aside this distinction, Defendants argue that both the Title VII and FEHA claims (which implicate discrimination based on race/national origin, age, and gender as well as retaliation) are barred by Ms. Grigorescu's failure to timely exhaust administrative remedies. *See* Mot. at 21.

In order to litigate a Title VII claim in federal district court, a plaintiff must have timely exhausted her administrative remedies. *See Greenlaw v. Garrett*, 59 F.3d 994, 997 (9th Cir. 1995). Similarly, "in order to bring a civil action under FEHA, the aggrieved person must exhaust the administrative remedies provided by law." *Rodriguez v. Airborne Express*, 265 F.3d 890, 896 (9th Cir. 2001).

With respect to Title VII,

United States District Court
Northern District of California

a charge must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred, except that when the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such EEOC charge shall be filed by or on behalf of the person aggrieved *within 300 days* after the alleged unlawful employment practice occurred, or within 30 days after receiving notice that the state or local agency has terminated the proceedings under the state or local law, whichever is earlier.

42 U.S.C. § 2000e-5 (emphasis added). Under FEHA, the administrative complaint must be filed within *one year* of the alleged unlawful practice, subject to a 90-day extension if the practice was not discovered within that period. *See* Cal. Gov't Code § 12960.

In the instant case, Defendants argue that Ms. Grigorescu failed to timely file an administrative complaint because the last alleged adverse employment action took place in January 2017 (*i.e.*, when she was terminated from the lab tech job) but she did not file any administrative complaint until more than a year later, *i.e.*, in February 2018 when she filed a complaint with the DFEH. *See* Defs.' RJN, Ex. 8 (DFEH complaint).

In response, Ms. Grigorescu essentially concedes that she did not timely file an administrative complaint but nevertheless argues that her Title VII and FEHA claims should not be barred because of the doctrine of equitable tolling. Opp. at 11-12. According to Ms. Grigorescu, she should be relieved of the need to timely file an administrative complaint because she was pursuing remedies in an alternate forum – *i.e.*, in state court where she filed a mandamus petition in December 2015 and where proceedings still are not completed. (As noted above, while the mandamus petition was denied in or about May 2018, the causes of action for employment discrimination asserted in the operative amended complaint appear to be pending.)

Ms. Grigorescu, however, fails to cite any authority supporting the proposition that there can be equitable tolling of an administrative proceeding while a plaintiff pursues a remedy in state court. In fact, California courts have declined to "extend the time for complying with an administrative deadline while the plaintiff pursued a judicial remedy," because administrative remedies are "intended as a precursor to an adversarial proceeding, ideally to render the judicial proceeding unnecessary." *Bjorndal v. Superior Court*, 211 Cal. App. 4th 1100, 1110 (2012).

20

Rather, only the inverse proposition is supported by state law – *i.e.*, that there can be equitable tolling of a state court proceeding where a plaintiff pursues a remedy for the same claims in an administrative context. *See McDonald v. Antelope Valley Community College District*, 45 Cal. 4th 88, 99 (2008) (holding that plaintiff's use of internal grievance procedure with community college did not preclude finding of equitable tolling); *Acuna v. San Diego Gas & Elec. Co.*, 217 Cal. App. 4th 1402, 1417 (2013) (finding that the equitable tolling doctrine was inapplicable where the plaintiff's racial discrimination claims were not "being considered or resolved" in a separate administrative proceeding).

Even if Ms. Grigorescu could rely on a state court proceeding to toll an administrative proceeding, she runs into another obstacle; that is, her state court proceeding largely focused on disability discrimination whereas, here, Ms. Grigorescu is asserting discrimination based on different grounds – *e.g.*, race/national origin, gender, and age. Ms. Grigorescu has not shown that equitable tolling may be applied where different claims were pursued in the forum upon which the tolling is based. *See Acuna*, 217 Cal. App. 4th at 1417 (finding no equitable tolling of administrative filing deadlines for racial discrimination claim where administrative proceedings did not consider or resolve racial discrimination claims). Similarly, Ms. Grigorescu does not allege that she raised race/national origin, gender, and/or age discrimination claims in any formal administrative proceeding or judicial proceeding prior to filing with the DFEH or EEOC; consistent with the pleadings filed with the Superior Court, Ms. Grigorescu appears to have only raised disability discrimination in the administrative proceedings.

The Court therefore dismisses the Title VII and FEHA claims for failure to timely exhaust administrative remedies. However, Ms. Grigorescu shall be given leave to amend because it is possible that she could allege a better factual basis of equitable tolling. Any new allegation must be made in good faith and comply with her obligations under Federal Rule of Civil Procedure 11.

I.    IIED Claim

Based on the Court's rulings above the IIED claim is potentially viable against only Mr. Whitlock and Ms. Frontiera. The factual underpinnings for the IIED claim are not entirely clear, but it appears the claim is based on the questioning of Ms. Grigorescu's educational credentials

21

and the subsequent suspensions and terminations.

Defendants argue first that the IIED claim should be dismissed as to both individual defendants because they are immune from state common law claims under California Government Code § 820.2. *See* Cal. Gov't Code § 820.2 ("Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."). The Court, however, need not address this argument because there is an independent basis for dismissal of the IIED claim.

To establish a prima facie case for IIED, a plaintiff must show:

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.

*Miller v. Fortune Commercial Corp.,* 15 Cal. App. 5th 214, 228-29 (2017). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not constitute extreme and outrageous conduct." *Okorie v. Los Angeles Unified Sch. Dist.*, 14 Cal. App. 5th 574, 597 (2017) (internal quotation marks omitted).

In the employment context, "routine decisions, such as hiring and firing, do not constitute extreme and outrageous conduct as a matter of law." *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55, 53 (1996). In *Janken*, the plaintiff alleged that defendants followed "a policy of terminating, or forcing the resignation of, employees over the age of 40 without good cause." *Id.* at 61. The court dismissed plaintiff's IIED claim, explaining that: "Managing personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society." *Id.* at 80. The court noted further that, even if a plaintiff alleges that personnel management is motivated by discrimination, they have failed to state an IIED claim, and "the remedy is a suit against the employer for discrimination." *Id.*

In the instant case, the IIED claim is deficient because it is based solely on routine employment decisions, such as suspending and terminating Ms. Grigorescu. Moreover, even if

some portion of the individual defendants' conduct was not routine, it would not rise to the level of extreme and outrageous conduct. In general, "[t]here is nothing, as a matter of law, extreme and outrageous about the act of terminating an employee on the basis of unproven or false or even malicious accusations." *McNaboe v. Safeway Inc.*, No. 13-cv-04174-SI, 2016 WL 80553 at \*5-6, 2016 U.S. Dist. LEXIS 2493 at \*16 (N.D. Cal. Jan. 7, 2016). While there are some cases in which false accusations did rise to the level of extreme and outrageous conduct, those cases are easily distinguishable from the instant case as they involved far more serious false accusations. *See, e.g.*, *Heineke v. Santa Clara Univ.*, 2017 U.S. Dist. LEXIS 201163 at \*29-30 (N.D. Cal. Dec. 5, 2017) (indicating that knowingly making false accusations of sexual harassment or child abuse or knowingly making false reports to the police can satisfy the requirement of extreme and outrageous conduct); *Fletcher v. Western Nat'l Life Ins. Co.*, 10 Cal. App. 3d 376, 401, 89 Cal.Rptr. 78 (1970) (holding that accusing plaintiff of insurance fraud "may legally be the basis for an action for damages for intentional infliction of emotional distress"). In the instant case, Ms. Grigorescu was charged with, at most, making false representations about her academic credentials.

The Court thus dismisses the IIED claim and with prejudice. There is no indication that Ms. Grigorescu is capable of curing the above deficiencies.

J.    <u>Public Policy Claim</u>

Ms. Grigorescu alleges that the District violated California's public policy. FAC ¶ 137. As discussed above, the District is entitled to immunity from state law claims under the Eleventh Amendment. Accordingly, the Court dismisses this claim with prejudice.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted. More specifically:

- All claims against the District are dismissed with prejudice based on Eleventh Amendment immunity, except for the Title VII claim.

- All claims against Mr. Joel are dismissed with prejudice.

- The § 1983 claim against Mr. Whitlock and Ms. Frontiera is dismissed but with leave to amend.

- The § 1981 claims against Mr. Whitlock and Ms. Frontiera are dismissed with leave to amend.
- The Title VII claims (against the District, Mr. Whitlock, and Ms. Frontiera) and the FEHA claims (against Mr. Whitlock and Ms. Frontiera) are dismissed with leave to amend.
- The IIED claim against Mr. Whitlock and Ms. Frontiera is dismissed with prejudice.
- The public policy claim against the District is dismissed with prejudice.

Any amended complaint must be filed within four weeks from the date of this order. This order disposes of Docket No. 14.

**IT IS SO ORDERED**.

Dated: April 24, 2019

_____
EDWARD M. CHEN
United States District Judge