United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIOLETA GRIGORESCU,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE SAN MATEO COUNTY COMMUNITY COLLEGE DISTRICT, et al.,<br><br>Defendants. | Case No. 18-cv-05932-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE**<br><br>Docket Nos. 40-41 |

Plaintiff Violeta Grigorescu ("Ms. Grigorescu") filed her third amended complaint ("TAC") against Eugene Whitlock ("Mr. Whitlock"), the former Vice Chancellor of Human Resources ("VCHR") at the San Mateo County Community College District (the "District"). Docket No. 39. In previous pleadings, Ms. Grigorescu raised claims against multiple defendants (*e.g.*, the District and various supervisors in their individual capacity). *See* Docket No. 1. The Court dismissed Ms. Grigorescu's first and second amended complaints with leave to amend, permitting Ms. Grigorescu to plead only two claims against Mr. Whitlock: (1) race-based termination under Section 1981; and (2) retaliatory harassment (First Amendment) claims under Section 1983. Pending before the Court is Mr. Whitlock's motion to dismiss that pleading. Docket No. 41 ("Mot."). Mr. Whitlock also concurrently filed a motion to strike certain factual allegations in TAC that support claims previously dismissed with prejudice. Docket No. 40. For the reasons discussed below, the Court **GRANTS in PART** and **DENIES in PART** Mr. Whitlock's motion to dismiss. Additionally, Mr. Whitlock's motion to strike is **GRANTED in PART** and **DENIED in PART**.

# I. BACKGROUND[1]

In 2004, Ms. Grigorescu was employed by the District as a laboratory technician. TAC ¶ 17. In 2008, she became a part-time, adjunct physics instructor. *Id*. In 2011, Ms. Grigorescu organized a group called Friends of CSM Gardens to oppose the conversion of an open-space garden into a parking lot. According to Ms. Grigorescu, she "organized students, contacted political figures, and advised members of the CSM Garden Club to attend campaign events of the President of the District's Board of Trustees." *Id*. ¶ 18. Ms. Grigorescu's activities with Friends of CSM Gardens led to a lawsuit (the "*Friends* lawsuit"). *Id*. ¶ 19. Ultimately, the litigation made its way to the California Supreme Court, and the court decided in favor of the plaintiffs in July 2017. *Id*. While the litigation was ongoing, in April 2011, the Board of Trustees openly attacked faculty members and students who participated in the *Friends* lawsuit. *Id*. ¶ 20 ("the students were badly led by some faculty representatives").

Several days before filing of the *Friends* lawsuit in 2011, Ms. Grigorescu began to have medical problems which required treatment. TAC ¶ 21. Joel (then-VCHR, *i.e.* Mr. Whitlock's predecessor) was resistant to her returning to work and made efforts to prevent her return. *Id*. ¶¶ 22–24. After Ms. Grigorescu's union intervened, she was allowed to resume her position as an adjunct professor of physics. *Id*. ¶ 25. In 2013, Ms. Grigorescu began to have different medical problems which required treatment, and Joel, Frontiera (Dean of the District's Math and Science division), and the District again made efforts to bar Ms. Grigorescu from working for the District. *Id*. ¶¶ 28–32. Eventually, in January 2014, Ms. Grigorescu was allowed to return to work as a lab technician, but the District gave the class that Ms. Grigorescu was scheduled to teach "to an instructor with less seniority." *Id*. ¶ 33.

Mr. Whitlock became VCHR in July 2014, although it is unclear when he fully assumed the role. TAC ¶ 35 (After Mr. Whitlock assumed the position, Joel remained active handling number of issues for a while). Mr. Whitlock, as outside County Counsel, previously represented

---

[1] Much of the facts alleged in the TAC are pled in the first amended complaint and in the second amended complaint. *See* Docket Nos. 25, 38. For purposes of brevity, the Court will not recite the facts in detail, unless where necessary.

2

the District in the *Friends* lawsuit. *Id.* After Mr. Whitlock assumed the VCHR position, a series of firings began, and "[p]laintiff was among the first to be targeted and fired." *Id.* Within weeks after assuming the VCHR position, Mr. Whitlock—either acting alone or with an aid and assistance of Frontiera[2]—subjected Ms. Grigorescu to various discriminatory incidents or actions that had an effect of isolating Ms. Grigorescu from her professional community and preventing her from supporting the *Friends* lawsuit. *See id.* ¶ 36. For instance, according to the TAC, Mr. Whitlock attempted to bypass Ms. Grigorescu's seniority right to which she was entitled by the American Federation of Teachers union contract. *Id* ¶ 37.

On August 4, 2014, Human Resource informed Ms. Grigorescu that her pay was going to be less than in the past due to the changes in HR policy that applies to employees holding both faculty and staff positions. TAC ¶ 38. Ms. Grigorescu subsequently was paid only the base rate for her work after hours, while other similarly situated employees were paid overtime. *Id.* Later in August, Ms. Grigorescu obtained permission from Frontiera to take part in the UMOJA community, an on-campus organization in support of minority communities in the District. *Id.* ¶ 39. Frontiera permitted Ms. Grigorescu to attend the September 2014 UMOJA gathering. *Id.* Three days after, however, Frontiera told Ms. Grigorescu that she cannot just leave work and participate in various events on campus. *Id.* ¶ 40. In following three weeks, Ms. Grigorescu consulted with her union representatives. *Id.* ¶ 41. Frontiera told Ms. Grigorescu's representatives that Ms. Grigorescu could not attend UMOJA because Ms. Grigorescu is white and UMOJA is for students of color. *Id.* ¶ 42. Ms. Grigorescu was ultimately prevented from interacting with UMOJA and, as a result, was unable to build her extracurricular portfolio necessary to her professional growth in the District. *Id.* ¶ 42. When discussing the issues of unfair treatment, discrimination, and lack of accommodations with Ms. Grigorescu's union representatives, Frontiera stated that she was following Mr. Whitlock's orders and that any conversation on the topic had to be carried on in the presence of Mr. Whitlock and Joel. *Id.* ¶ 43.

---

[2] The TAC contains some factual allegations regarding Frontiera's retaliatory actions, but all Section 1983 claims against Frontiera have been dismissed with prejudice by the Court's previous Order. *See* Docket No. 38 ("Order") at 14.

3

1	In September 2014, Frontiera sent an e-mail to Ms. Grigorescu that accused Ms. Grigorescu of "double-dipping" her substitute teaching during her lab work hours. Upon Ms. Grigorescu's denial, Frontiera asked Ms. Grigorescu to provide official document showing her presence in the office. TAC ¶ 44. Later, under the direction of Mr. Whitlock, Frontiera banned Ms. Grigorescu from substitute teaching. *Id.* ¶ 45. Frontiera nonetheless permitted another lab technician to continue to teach who was a male, not Romanian, and not involved in the Friends lawsuit. *Id*.

In October 2014, Frontiera informed Ms. Grigorescu that the dean will consider Ms. Grigorescu's extracurricular activities in evaluating her teaching performance. TAC ¶ 46. A few days later, Frontiera submitted Ms. Grigorescu's teaching performance evaluation where Frontiera marked lower performance ratings without justification. Despite Ms. Grigorescu's request of correction, Frontiera did not erase the lower ratings, which were recorded in Ms. Grigorescu's file. *Id.* ¶ 47.

Later in October 2014, for the first time in ten years, a full-time physics professor position was approved by the District. Mr. Whitlock changed the policy regarding the minimum qualification for the position, in order to create disadvantages to internal applicants like Ms. Grigorescu. TAC ¶ 48. Within days after Ms. Grigorescu applied for the full-time position in May 2015, Mr. Whitlock removed Ms. Grigorescu from the application pool for the full-time physics position. *Id*. ¶ 49. With respect to Ms. Grigorescu's educational credentials, Mr. Whitlock claimed that she misrepresented her degree she received in Romania as a master's degree, although the degree is only equivalent to a bachelor's degree. *Id*. ¶ 50. When Ms. Grigorescu responded that other universities had recognized her Romanian degree as a master's, Mr. Whitlock called each educational institution. *Id*. ¶ 51. As a result of Mr. Whitlock's calls, some universities changed their designation of her degree from a master's to bachelor's, and one university decided to offer no teaching appointments for the following year. *Id.* Later in 2015, Ms. Grigorescu was ultimately not selected for the full-time teaching position despite her qualification and teaching experience. *See id*. ¶¶ 52–61. Mr. Whitlock and Frontiera prevented Ms. Grigorescu from teaching classes on the basis of Ms. Grigorescu's physical injuries. *See id*.

¶¶ 62–63. Regarding her physical disabilities, Ms. Grigorescu additionally alleges in TAC that other employees were allowed to teach despite physical disabilities because they were not Romanian and were not involved in the *Friends* suit. *Id.* ¶ 63.

In May 2015, Mr. Whitlock told Ms. Grigorescu that she would be fired if she had not resigned. TAC ¶ 67. In TAC, Ms. Grigorescu asserts that Mr. Whitlock's attempt to terminate her was motived by the fact that Ms. Grigorescu is Romanian and participated in the *Friends* lawsuit. *Id.* Throughout 2015, the District attacked Ms. Grigorescu's academic credentials without justification and refused to accommodate her physical and emotional disabilities. *Id.* ¶¶ 68–80.

In 2016, the District issued its first letter of suspension after Ms. Grigorescu notified the District about her teaching at San Francisco State University ("SFSU").[3] TAC ¶ 81. After the District retracted the first suspension, Mr. Whitlock reissued the letter of suspension and proposed termination on the ground that Ms. Grigorescu missed six consecutive Fridays without prior approval.[4] *Id.* ¶ 84. Mr. Whitlock also attempted to reclassify Ms. Grigorescu as a temporary employee who would not be eligible for grievance rights. *Id.* ¶ 87. During a *Skelly* hearing in November 2016, the hearing officer found Ms. Grigorescu was entitled to accept the teaching appointment at SFSU to mitigate her wage loss. *Id.* ¶ 91. The officer, however, recommended termination of Ms. Grigorescu's employment on the basis of Ms. Grigorescu's misrepresentation of her math minor and her Baccalaureates high school diploma. *Id.* ¶ 91.

In January 2017, Ms. Grigorescu's employment was terminated, and she was banned from coming on campus until September 27, 2018. TAC ¶¶ 92–93.

## II.     <u>MOTION TO DISMISS</u>

A.    <u>Legal Standard</u>

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

---

[3] Plaintiff alleges that because the District only allowed Plaintiff to work as a lab technician, Plaintiff had suffered from economic hardship and accepted the teaching position at SFSU to mitigate her wage losses. *See* TAC ¶ 76.

[4] The District later retracted two days: one because Plaintiff was at the District all day and another that was officially closed as President Day. TAC ¶ 84.

5

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).[5] "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B. <u>Discussion</u>

    1. <u>Race-Based Termination (42 U.S.C. § 1981)</u>

To establish a race-based termination claim, a plaintiff must show that (1) she was a member of a protected group; (2) she was qualified for the position; (3) she was discharged or suffered an adverse employment action; and (4) similarly situated, non-protected employees were treated more favorably. *McDonnel Douglas Corp v. Green,* 411 U.S. 792, 802 (1973). The Court previously found that Ms. Grigorescu alleged the first three elements. *See* Order at 12. With regard to (4), however, the Court found that Ms. Grigorescu failed to show that similarly situated, non-protected employees were treated more favorably. *Id*. The Court specifically pointed that

---

[5] A court "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

6

Ms. Grigorescu did not allege that her replacement was hired at or close in time to her termination:

> As to (4), [Ms. Grigorescu] alleges that an individual of a different race and inferior qualifications filled her position. Her replacement was not Romanian, recently received a master's degree, and had less teaching experience. [citation omitted.] However, [Ms. Grigorescu] did not allege that her alleged replacement was hired at or close in time to her termination. If there was a substantial gap of time between her termination and subsequent replacement, the new person may not be similarly situated, and thus inference of race-based termination will be problematic.

*Id*. With that, the Court instructed Ms. Grigorescu to "set forth factual allegations that her replacement assumed her prior position in a timeframe that would lead to a reasonable inference of discrimination, provided that she can do consistent with Rule 11." *Id*.

However, Ms. Grigorescu's TAC contains no additional facts as to the time gap between her termination and the hiring of her replacement. Instead, Ms. Grigorescu repeats her claims asserting Mr. Whitlock's violation of Section 1981, including claims for race-based harassment that were previously dismissed without leave to amend. *See* Order at 14. Although the Court in its last Order granted leave to amend only to her race-based termination claims, Ms. Grigorescu realleges her Section 1981 claims altogether—race-based termination and race-based harassment—under the title of "Race-Based Harassment (42 United States Code § 1981)." *See* TAC at 24.

To the extent she attempts to replead, Ms. Grigorescu's Section 1981 race-based harassment claim remains **DISMISSED with prejudice**. *See Tavake v. Alameda County Bd. Of Supervisors*, 2005 WL 2290308 at *3 (N.D. Cal. Sep. 20, 2005) (dismissing a claim with prejudice that was previously dismissed with prejudice); *Rodriguez v. L.A. Cty. Sheriff's Dep.*, 2014 WL 12703416 at *2 (C.D. Cal. July 7, 2014) (granting a motion to dismiss, noting that Plaintiff erroneously realleges claims against Defendant that the Court previously dismissed without leave to amend).

Ms. Grigorescu renewed many race-based harassment factual allegations in support for her unlawful termination claim. These allegations, as found previously, are conclusory and do not lead to a reasonable inference they were based on race or national origin. Plaintiff failed to respond to the Court's instruction to enhance the pleading relative to her replacement.

7

Since Ms. Grigorescu fails to cure the deficiencies the Court raised in its last Order, her Section 1981 claim is **DISMISSED without leave to amend**.

2. Retaliatory Harassment (42 U.S.C. § 1983)

a. Background

A plaintiff may assert a Section 1983 claim where a plaintiff alleges retaliation by state actors for the exercise of the plaintiff's First Amendment rights. *See Mt. Healthy City Sch. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977). To state a claim for violation of First Amendment under Section 1983, a plaintiff must show that (1) she was engaged in protected activity; (2) the defendant took adverse employment action; and (3) her speech was a substantial or motivating factor for the adverse employment action. *Coszalter v. Cty. of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

Here, parties do not dispute factor no. (2) that Mr. Whitlock took an adverse action against Plaintiff. *See* Order at 13. The parties dispute, however, (1) whether Plaintiff was engaged in protected activity; and (3) whether her allegedly protected activity was a substantial or motivating factor for the adverse employment action. *Id*. As to (1), the Court previously found that Ms. Grigorescu has made some allegations of her participation in the *Friends* lawsuit and has provided details inferring that Mr. Whitlock had both constructive and actual notice of Ms. Grigorescu's participation in the lawsuit. *Id*. The Court noted, however, that Ms. Grigorescu failed to allege facts showing the substantial or motivating factor. *Id*. The Court rejected Ms. Grigorescu's argument that the fact Mr. Whitlock served as counsel for the District in the lawsuit alone establishes that Ms. Grigorescu's participation in the suit was the substantial and motivating of Mr. Whitlock's adverse employment action.[6] *Id*. at 13. The Court specifically pointed that according to her second amended complaint, Mr. Whitlock's first adverse action against Ms. Grigorescu came *years* after the onset of the *Friends* suit and *nine months* after Mr. Whitlock

---

[6] Plaintiff nonetheless asserts in her opposition, "Defendant, as lead counsel representing the District . . . was well acquainted with Plaintiff's active role". *See* Opp. at 3–4. Plaintiff contends that combined with Plaintiff's strong reputation in the community, Defendant's role as lead counsel shows his retaliatory intent that had persisted for three years until he assumed the VCHR position. *Id*. at 4.

8

assumed the VCHR position. *Id*. at 13–14. The Court concluded that the time gaps indicated a lack of "temporal proximity" *i.e*., Ms. Grigorescu failed to establish a causal link between the protected activity and the adverse actions. *See id*. 14. In addressing the Court's concerns, counsel for Ms. Grigorescu under Federal Rule of Civil Procedure 11 represented at the hearing:

> [Ms. Grigorescu's counsel] could supplement the pleadings with additional factual allegations that [Mr. Whitlock] took adverse actions against [Ms. Grigorescu] before he assumed the role of VCHR. Stated differently, plaintiff's counsel represented that there are allegations that [Mr. Whitlock] adversely affected Plaintiff's ***appointment as early as 2011*** (by influencing District employees with decision-making authority vis-à-vis [Plaintiff's] involvement with *Friends*). He also represented there is evidence that [Mr. Whitlock] took adverse action ***shortly after*** he became VCHR.

*Id*. (emphasis added). Based on Ms. Grigorescu's counsel's representation, the Court granted leave to amend and specifically instructed Ms. Grigorescu to add factual allegations, if she could under her Rule 11 obligations, showing (1) Mr. Whitlock's adverse actions before he became VCHR, *i.e.*, as early as 2011; and (2) Mr. Whitlock's adverse actions immediately after he assumed the position in July 2014. *Id*.

Ms. Grigorescu accordingly amended her complaint. Although the TAC adds no allegation regarding Mr. Whitlock's action before he became the VCHR, it does add factual allegations that Mr. Whitlock started retaliating shortly—within just weeks—after he assumed the VCHR position in July 2014. *See* TAC ¶¶ 36–47.

        b.      <u>Analysis</u>

Whether an employment action is in retaliation for protected activities is a question of fact that must be decided in the light of the timing and other surrounding circumstances. *Coszalter*, 320 F.3d at 977–78 [noting that there is no set time beyond which acts cannot support an inference of retaliation]). A causal link between the protected activity and the adverse action "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activity and the proximity in time between the protected activity and the allegedly retaliatory employment decision." *Yartfzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

With respect to the proximity in time, there are two time gaps at issue: (1) the time gap

between her protected activity (the *Friends* lawsuit in 2011) and the first alleged adverse action (May 2015); and (2) the time gap relating to the period Mr. Whitlock became VCHR (July 2014) and the first alleged adverse action (May 2015).

As for (1), the Court notes that Ms. Grigorescu fails to add facts alleging adverse actions before he became VCHR in July 2014. Ms. Grigorescu's allegations as to Mr. Whitlock's action in 2011, 2012, or 2013 have remained unchanged from her previous pleading. The omission does not necessarily end the inquiry.

> A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic. [Citation omitted] Retaliation often follows quickly upon the act that offended the retaliator, but this is not always so. For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation. We should be particularly sensitive to this last point, for if we establish a per se rule that a specified time period is too long to support an inference of retaliation, well-advised retaliators will simply wait until that period has passed. Then—provided that the retaliator has not revealed to others his intention, and has not provided demonstrably false or pretextual reasons for his act—he may retaliate with impunity.

*Coszalter*, 320 F.3d at 978.

The TAC strengthens the inference of retaliation, adding factual allegations of adverse actions that started immediately after Mr. Whitlock became VCHR:

- Within weeks after assuming the VCHR position, Mr. Whitlock—either acting alone or with an aid and assistance of Frontiera[7]—subjected Ms. Grigorescu to various discriminatory incidents or actions that had an effect of isolating Ms. Grigorescu form her professional community and preventing her from supporting the Friends lawsuit. TAC ¶ 36;

- Mr. Whitlock attempted to bypass Ms. Grigorescu's seniority right to which she was entitled by the American Federation of Teachers union contract. *Id.* ¶ 37;

---

[7] The TAC contains some factual allegations regarding Frontiera's retaliatory actions, but all Section 1983 claims against Frontiera have been dismissed with prejudice by the Court's previous Order. *See* Order at 14.

10

- Due to the HR policy change made in August 2014, Ms. Grigorescu subsequently was paid only the base rate for her work after hours, while other similarly situated employees were paid overtime. *Id*. ¶ 38;
- Frontiera prevented Ms. Grigorescu from participating in the UMOJA community, an on-campus organization in support of minority communities in the District. *Id*. ¶¶ 39, 40. In discussing the issue with Ms. Grigorescu's union representatives, Frontiera stated that she was following Mr. Whitlock's orders and that any conversation on the topic had to be carried on in the presence of Mr. Whitlock and Joel. *Id.* ¶¶ 41–43;
- In October 2014, Frontiera informed Ms. Grigorescu that the dean will consider Ms. Grigorescu's extracurricular activities in evaluating her teaching performance. *Id*. ¶ 46. Later, Frontiera submitted Ms. Grigorescu's teaching performance evaluation where Frontiera had marked lower ratings without justification. *Id.* ¶ 47.

The Court finds that these new allegations sufficiently plead a substantial and motivating factor. Although the alleged retaliation occurs years after Mr. Whitlock's involvement in the lawsuit, he was not in a position to retaliate against Ms. Grigorescu since he did not work for the District. In assessing the time proximity at issue, a fair argument can be made that the time should be measured from the point at which Mr. Whitlock obtained the authority to adversely affect Ms. Grigorescu's employment—here within weeks of Mr. Whitlock actually taking over the VCHR position. *See Lindner v. Int'l Business Machines Corp*., No. 06–CV–4751, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) (noting that "retaliation claims are rarely dismissed pursuant to Rule 12(b)(6) where the Plaintiff has alleged a time period of less than one year between the protected activity and the alleged retaliatory conduct").

Ms. Grigorescu further makes allegations that support inference of retaliatory motive by Mr. Whitlock.

- Mr. Whitlock explained that he removed Ms. Grigorescu from the application pool for the full-time teaching position, because base on his research, Ms. Grigorescu's master's degree she received in Romania was only equivalent to a bachelor's degree and Ms. Grigorescu knowingly misrepresented it as master's degree. TAC ¶

11

|   |   |
|---|---|
| 1 | 50. Although *Skelly* hearing later recommended termination of Ms. Grigorescu's |
| 2 | employment due to her alleged misrepresentation of her degrees, Ms. Grigorescu |
| 3 | maintains that her Romanian academic credentials are equivalent to master's |
| 4 | degree, and thus Mr. Whitlock's explanation is factually incorrect. *Id*. ¶ 91. |

- Frontier—allegedly under the control and direction of Mr. Whitlock—explained that Ms. Grigorescu could not teach, because her injuries would prevent her from handing emergencies in class. *Id*. ¶ 62. Ms. Grigorescu contends that this explanation is pretextual because other employees in similar situation were allowed to teach despite their physical constraints. *Id*. ¶ 63.

- Mr. Whitlock issued the letter of suspension and termination on the grounds Ms. Grigorescu missed six consecutive days.[8] TAC ¶ 84. Ms. Grigorescu counters that she is entitled to take three days off within her CFRA (California Family Rights Act) leave and has a contractual right to take additional day for a sick leave. *Id*.

Mr. Whitlock nonetheless contends that Ms. Grigorescu fails to adequately plead the element of substantial and motivating factor, because no facts suggest that Mr. Whitlock had any knowledge of Plaintiff's alleged First Amendment activities. Mot. at 7–8 ("distinct from the litigation itself-was generally known to the community"). Particularly, with respect to the time before he was hired by the District in July 2014, Mr. Whitlock contends that he was not aware of Ms. Grigorescu's activities in the *Friends* lawsuit, therefore could not take any action in retaliation. *Id.; see Ambrose v. Twp. of Robinson, Pa*., 303 F.3d 488, 493 (3d Cir. 2002) (suggesting that, "for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct"). The Court concludes that Ms. Grigorescu sufficiently alleges that Mr. Whitlock had knowledge of Ms. Grigorescu's activities at issue. In TAC, Ms. Grigorescu specifically alleges that within weeks after Mr. Whitlock assumed the VCHR position—when he took the adverse employment action for the first time, Mr. Whitlock acted "because of Plaintiff's protected activity." TAC ¶ 36. Such an allegation is also implicit in

---

[8] The District later retracted two days: one because Plaintiff was at the District all day and, another that was officially closed as national holiday. TAC ¶ 84.

12

Ms. Grigorescu's assertion that Mr. Whitlock's conduct "had the effect of dissuading [her] from continuing to engage in protected activity; namely: her continuing support of the ongoing lawsuit." *Id*. Ms. Grigorescu alleges Defendant was aware of her activities when he committed alleged retaliation. He was lead counsel for the defendant in the lawsuit. *Id*. ¶ 4. Ms. Grigorescu has made sufficient allegations as to Mr. Whitlock's knowledge. *See Jones v. Quintana*, 831 F. Supp. 2d 75, 84–85 (D.D.C. 2011) (denying a motion to dismiss, because Plaintiff has sufficiently pled Defendant's knowledge by alleging that Defendant "was aware of [Plaintiff's speech] by the time Defendant took the challenged employment action for the first time).

To survive a motion to dismiss, plaintiffs need to only plausibly allege that retaliatory animus was a substantial or motivating factor to state a First Amendment retaliation claim. *See, e.g., The Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (reversing the district court's dismissal of a Section 1983 claim, noting, "[a]t this early stage of litigation, [the Court] takes [Plaintiff's] allegations as true and construe them in the light most favorable to [Plaintiff]"); *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (circumstantial evidence sufficiently establishes retaliatory intent for 12(b)(6) purposes). Here, Ms. Grigorescu added factual allegations which in the aggregate may give rise to a plausible inference of retaliatory motivation. Her theory of retaliation, even if vague, withstands a 12(b)(6) motion on the basis of liberal rules of notice pleading. *See Hansen v. Malloy*, No. 3:10-CV-00110-RCJ-VP, 2010 WL 3070451, at *3 (D. Nev. Aug. 3, 2010).

Accordingly, Mr. Whitlock's motion to dismiss Section 1983 claim for First Amendment retaliation is **DENIED**.

### III. <u>MOTION TO STRIKE</u>

Pursuant to Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). *See also Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973–74 (9th Cir. 2010). The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993).

United States District Court
Northern District of California

Here, Mr. Whitlock moves to strike following from Ms. Grigorescu's pleading:

- The claims against the District, Frontiera, and Joel as improper Defendants.
- The paragraphs concerning Ms. Grigorescu's physical injury and/or disabilities.
- The paragraphs as to Mr. Whitlock's adverse actions before he was employed with the District.
- Ms. Grigorescu's prayer for relief based on California Government Code Section 12965(b).

As to the claims against the District, Frontiera, and Joel, Mr. Whitlock asserts that all claims against each of them have been dismissed by the Court's previous orders. *See* Docket No. 40 ("MTS") at 6. As to claims regarding Mr. Whitlock's adverse action before July 2014 and claims concerning Ms. Grigorescu's physical injuries and disabilities, Mr. Whitlock contends that Ms. Grigorescu's allegations are impertinent and immaterial, and thus have no legal bearing on Ms. Grigorescu's claims for retaliatory harassment or for race-based termination. *Id*. As to the prayer for relief under California Government Code Section 12965(b), Mr. Whitlock moves to strike the prayer, on the ground that Ms. Grigorescu's prayer for relief relies on California Fair Employment and Housing Act ("FEHA"), under which Ms. Grigorescu had not brought a claim. *Id*.

Because Ms. Grigorescu did not bring a claim based on FEHA, her prayer for relief relying on FEHA should be stricken. All remaining parts of the pleading, however, survives 12(f) motion, as they are neither immaterial or impertinent. Motions to strike are disfavored and "are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *LeDuc v. Ky. Cent. Life Ins. Co*., 814 F. Supp. 820, 830 (N.D. Cal. 1992).

Here, paragraphs concerning Ms. Grigorescu's health issues and claims against the District, Frontiera or Joel are not immaterial or impertinent for purposes of a Rule 12(f) motion. In conjunction with other allegations, the claims at issue— although not essential to Plaintiff's claim or provides a direct basis of liability—might be probative of Mr. Whitlock's actions in retaliation for the *Friends* lawsuit. The statements referring to other similarly situated employees

14

may enhance her claim that Mr. Whitlock's motive is retaliatory, contrary to his explanation that Ms. Georgescu was prevented from teaching on the basis of her health issues. *Wynes v. Kaiser Permanente Hosps.*, No. 2:10-CV-00702-MCE, 2011 WL 1302916, at *13 (E.D. Cal. Mar. 31, 2011). The claims against other defendants may further support her injuries suffered from their alleged retaliation in connection with or under the control of Mr. Whitlock. *See Colaprico v. Sun Microsystems, Inc*. 758 F.Supp. 1335, 1340 (N.D. Cal. 1991).

Accordingly, Mr. Whitlock's motion to strike Ms. Grigorescu's prayer for relief based on California Government Code Section 12965(b) is **GRANTED**. The motion to strike other claims/allegations is **DENIED.**

## IV. CONCLUSION

For the foregoing reasons, Mr. Whitlock's motion to dismiss is granted in part and denied in part:

- The motion to dismiss Section 1981 claim for race-based termination is **GRANTED with prejudice**;
- The motion to dismiss Section 1983 claim for retaliatory harassment is **DENIED**.

Mr. Whitlock's motion to strike is granted in part and denied in part:

- The motion to strike prayer for relief based on California Government Code Section 12965(b) is **GRANTED**;
- The motion to strike other claims are **DENIED**.

This order disposes of Docket Nos. 40 and 41.

**IT IS SO ORDERED**.

Dated: December 23, 2019

_____
EDWARD M. CHEN
United States District Judge

15