United States District Court
Northern District of California

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4

5    VIOLETA GRIGORESCU,                    Case No.  18-cv-05932-EMC

6                    Plaintiffs,
                                            **ORDER GRANTING DEFENDANT'S**
7          v.                               **MOTION FOR SUMMARY**
                                            **JUDGMENT**
8    BOARD OF TRUSTEES OF THE SAN
     MATEO COUNTY COMMUNITY
9    COLLEGE DISTRICT, et al.,              Docket No. 100

10                   Defendants.

11

12                  **I.        INTRODUCTION**

13        Plaintiff Violeta Grigorescu ("Ms. Grigorescu") was a former lab technician and adjunct

14   professor at the College of San Mateo and the San Mateo Community College District ("District").

15   Ms. Grigorescu was involved in an environmental organizing group and litigation against the

16   District that opposed the demolition of a campus garden to construct an additional parking lot

17   ("Friends litigation").  As the litigation was ongoing, the District and Ms. Grigorescu had a series

18   of employment disputes involving degree qualifications for teaching and abuse of leave

19   privileges.  Defendant Eugene Whitlock ("Mr. Whitlock") was the Vice Chancellor for Human

20   Resources for the District and General Counsel during the time many of these disputes took place.

21   Ultimately the District and Mr. Whitlock terminated Ms. Grigorescu for her work absences.

22   Plaintiff claims this was part of a retaliatory scheme against her because of her activism to

23   preserve the garden.  Mr. Whitlock moves for Summary Judgment.  It is currently the only motion

24   pending before the court.

25                  **II.       FACTS AND BACKGROUND**

26   A.     Factual Background

27          1.      Speech Activity

28          In 2004, Ms. Grigorescu was employed by the District as a laboratory technician at the

College of San Mateo ("CSM").  Docket No. 124 ¶ 20 (Grigorescu Decl.).  In 2008, she became a part-time, adjunct physics instructor at CSM.  *Id.* at ¶ 28.

Throughout 2011, Ms. Grigorescu participated in an environmental organizing group called "Friends of CSM Gardens" ("Friends") to oppose the conversion of a campus garden into a parking lot.  She spoke daily about what her group was doing to oppose the destruction of the gardens with Charlene Frontiera, the Dean of Math and Science ("Dean Frontiera").  *Id.* at ¶ 41.  Ms. Grigorescu created a PowerPoint, was a main organizer of a teach-in, gave updates at a union meeting, and sent emails and individually communicated with campus members regarding garden demolition opposition.  *Id.* at ¶¶ 67-70.  She and other leaders of Friends met with CSM President Mike Claire ("President Claire") to discuss concerns about the plan to build a parking lot.  *Id.* at ¶ 47._  She made comments at a District Board of Trustees ("Board") meeting and submitted a letter to the Board expressing her appreciation of the gardens and nature.  Morrison Decl. Exh. 6. pp. 124:21, 126:14-20.

In April 2011, Friends filed a lawsuit against the District opposing garden demolition.  *Id.* at ¶ 65-66.  In 2016, the California Supreme Court ultimately heard the case in *Friends of College of San Mateo Gardens v. San Mateo County Community College District,* 1 Cal.5th 937, 207 Cal. Rptr. 3d 314, 378 P.3d 687 (Cal. 2016) ("*Friends*").  Ms. Grigorescu was also involved in a group called "Citizens for a Green San Mateo" that sued the District for the destruction of trees on campus in connection with multiple construction projects.  *Id.*  The case was *Citizens for a Green San Mateo v. San Mateo County Community College District,* 226 Cal.App.4th 1572 (Cal. Ct. App. 2014) ("*Citizens*").

During this time, Mr. Whitlock was a deputy attorney at the San Mateo County Counsel and acted as General Counsel for various school districts and agencies in San Mateo County.  Docket No. 101 ¶ 3 (Whitlock Decl.).  He was assigned to both *Friends* and *Citizens*.  He identified a firm with CEQA expertise to litigate the case, reviewed occasional pleadings, and observed some court hearings.  *Id.* at ¶ 4.  Mr. Whitlock was not an attorney of record in the initial *Friends* lawsuit in 2011, though he was an attorney of record in the California Supreme Court case *Friends* and in the second case *Citizens*.  In July of 2014, Mr. Whitlock became the Vice

United States District Court
Northern District of California

1  Chancellor of Human Resources (VCHR) at the District.  Grigorescu Decl. ¶ 90-91.

2          2.          First Termination Attempt

3          On March 18, 2015, Ms. Grigorescu applied for a full-time physics teaching position at

4  CSM.  *Id.* at ¶ 97.  State regulation requires that applicants for college teaching positions have a

5  Master's degree, or apply for Equivalency.  Docket No. 100-2 at 96 (Grigorescu Responses to

6  Interrogatories ¶15).  Equivalency requires 24 credits of graduate level coursework and is

7  equivalent to possessing a master's degree.  Docket No. 100-2 at 51 (Grigorescu Responses to

8  Interrogatories at 4).  On March 26, 2015, Mr. Whitlock informed Ms. Grigorescu that after a

9  "routine check" he found that she did not have the qualifications for the position, and that her

10  claim of a master's degree from the University of Bucharest contradicted the district's records.  *Id.*

11  at ¶ 98.  There is a dispute about whether she has the equivalent of a master's degree in the U.S. as

12  she represented.

13          In 1986, Ms. Grigorescu graduated with a "Diploma de Licentia" from the University of

14  Bucharest after three years of study of physics and mathematics and an additional year of specialty

15  coursework within physics.  Grigorescu Decl. ¶ 8.  Mr. Whitlock hired an independent firm to

16  conduct an equivalency evaluation for Ms. Grigorescu.  Docket No. 100-2 at 1726-27 (Whitlock

17  Deposition 200:24-25 to 201:1-6).  The firm determined she had only a bachelor's degree.  *Id.*

18  Mr. Whitlock also called each of Ms. Grigorescu's degree-granting institutions to verify the

19  degree equivalency.  *Id.* at 201:24-25.  There is also a dispute about whether those institutions

20  confirmed or denied her degree equivalency.  Ms. Grigorescu provided Mr. Whitlock with a

21  document from the Minister of Education at the University of Bucharest that attested that a

22  "Diploma de Licenta" was equivalent to a master's degree in physics.  Docket No. 100-2 at 1745

23  (Whitlock Deposition Part II at 219).  Mr. Whitlock contests that the document was from an

24  unknown organization which was not associated with the university where Ms. Grigorescu

25  received her degree.  Docket No. 100-2 at 1746 (Whitlock Deposition Part II at 220).

26          Mr. Whitlock then required her to submit a form to apply for equivalency to be a candidate

27  for the position.  Grigorescu Decl. at ¶ 103.  She then submitted a form.  She interviewed but

28  ultimately was not chosen for the position.  *Id.* at ¶ 116.

United States District Court
Northern District of California

1    Also at this time in April 2015, the District banned Ms. Grigorescu from both her lab tech

2    and teaching positions on the basis of a flaring up of chronic pain as a result of excessive stress

3    from obtaining equivalency statements.  Grigorescu Decl. at ¶ 110.  Ms. Grigorescu was instructed

4    to take a leave of absence from both positions "based on my alleged inability to bend to unlock a

5    cabinet."  *Id.* at ¶ 111-12; Frontiera Deposition 161:19.  As a result of a meeting with Ms.

6    Grigorescu's union representatives, Dean Frontiera allowed Ms. Grigorescu to conduct only the

7    lecture portion of the physics class.  Grigorescu Decl. ¶ 112.

8    On Thursday, May 28, 2015, Mr. Whitlock held a pre-disciplinary meeting regarding her

9    equivalency.  Docket No. 100-2 ¶ 81 (Grigorescu Supplemental Amended Responses to Whitlock

10   Interrogatories) ("Grigorescu Responses").  On June 9, Mr. Whitlock served Ms. Grigorescu an

11   official notice of termination and suspension without pay, charging her with misrepresentation of

12   credentials and a pattern of lying about her degrees.  *Id.* at ¶ 85.

13   On June 17, 2015, a *Skelly* hearing took place before President of CSM Mike Claire

14   ("President Claire").  Grigorescu Decl. at ¶ 124.  A *Skelly* hearing is a pre-disciplinary procedure

15   that allows public employees to challenge proposed disciplinary actions by their employer before

16   those actions are finalized.  It ensures that the employee has due process rights.  Ms. Grigorescu

17   and Mr. Whitlock were present.  *Id.*  The record does not reflect the precise issues raised in the

18   hearing.  At the end of the hearing, President Claire upheld Mr. Whitlock's recommendation for

19   termination.  *Id.*

20   In July, Ms. Grigorescu appealed.  *Id.* at ¶ 126.  An appeal hearing was held before the

21   Board of Trustees with presiding officer Kathy Meola (*Grigorescu I*).  Whitlock Decl. ¶ 8.  Ms.

22   Meola was a Chief Deputy at San Mateo County Counsel.  Docket No. 101-1 at 244.  Crucially,

23   between the first and second days of the hearing, the District submitted a new letter it received

24   from the University of Bucharest confirming that Ms. Grigorescu's "Bachelor Diploma is

25   equivalent with the Master Diploma and implies all legal rights conferred by it."  *Id.* at 252.

26   On August 6, 2015, Meola ruled that the District did not meet its burden of proof to show

27   that Ms. Grigorescu was dishonest in stating that her degree was equivalent to a master's degree.

28   Docket No. 101-1 at 249 (Whitlock Decl. Exh. 30).  Meola determined the following findings of

4

fact:

> 3. Appellant acknowledged that while she did not receive two separate degrees from the University of Bucharest, she possessed one degree, which was equivalent to a bachelor's degree and a master's degree from the University of Bucharest, and Appellant attempted to show that equivalency on her resume by breaking the equivalency into two degrees.  *Id.* at 246.

> 9. …In review of the evidence presented by both sides, it would have been more accurate for Appellant to list one degree on her resume and explain that her degree was equivalent to a bachelor's degree and a master's degree, but the evidence simply does not exist to show that Appellant lied or was dishonest in her representation that she had both a bachelor's degree and a master's degree from the University of Bucharest.  *Id.* at 248.

Meola also found that Ms. Grigorescu misrepresented that she had a minor in mathematics, because "Appellant admitted that she has no testimonial evidence to support her claim."  *Id.* at 248.  Further, Meola found that Ms. Grigorescu misrepresented that her Diploma de Baccalaureate was a bachelor's degree, as it was in fact her high-school diploma.  *Id.*  Meola rejected termination, but recommended discipline.  *Id.*  The Board accepted her recommendations and allowed Ms. Grigorescu to return to classified lab tech position.  *Id.* at 253-54.  She also received a two-and-a-half month unpaid suspension.  Docket No. 101-2 at 489.

>    3.    Second Termination Attempt and Successful Termination

In 2016, Mr. Whitlock made a second attempt to terminate Ms. Grigorescu, which was successful.

First, Ms. Grigorescu made several requests to take leave for doctor's appointments and vacation days.  Grigorescu Decl. ¶¶ 137-39.  It is disputed that those requests were not submitted in a timely manner as required under her union contract.  *Id.*

Next, Ms. Grigorescu then requested a four-day per week lab tech schedule so she could teach at San Francisco State University on Fridays.  *Id.* at ¶¶ 142-48.  Dean Frontiera denied the request.  *Id.* at ¶ 148.  Dean Frontiera also denied a second request.  *Id.* at ¶ 153.  Ms. Grigorescu asserts that Dean Frontiera was "under orders" from Mr. Whitlock.  Docket No. 100-2 at 127 (Grigorescu Responses to Interrogatories ¶134).

Next, Mr. Whitlock and Dean Frontiera did not give Ms. Grigorescu teaching assignments

United States District Court
Northern District of California

for 2016, for disputed reasons. Dean Frontiera stated that Ms. Grigorescu lacked official degree equivalency from an evaluation agency that confirmed her "Diploma de Licenta" from the University of Bucharest was equivalent to a master's degree in the U.S. Grigorescu Decl. at ¶150; Docket No. 100-2 at 1490 (Frontiera Deposition at 274:15-17). Ms. Grigorescu states that the District granted her equivalency in 2008, when she first started the adjunct professor position. *Id.* at 99 (Grigorescu Responses to Interrogatories ¶ 23). Her 2008 equivalency was based upon her completion of 33 graduate credits at San Francisco State University between 2005 and 2008, and granted her equivalency to teach at CSM for life. *Id.*

Finally, a second series of disputes over Ms. Grigorescu's leave privilege ensued. On Friday February 5, 2016, Ms. Grigorescu requested and was approved 5.5 hours of "sick time" for the same day, and used that time to teach at SFSU. Grigorescu Decl. ¶ 156. She then logged her leave as "personal necessity" time, which unlike "sick time," could be used at any time for any reason. *See id.* Two weeks later on Friday, February 19, Ms. Grigorescu notified Dean Frontiera she was using four hours of "personal necessity" time that same morning and would return to work in the afternoon. *Id.* at ¶ 159. Around noon, Dean Frontiera sent her a letter of suspension for missing work without permission. *Id.* It is disputed that Ms. Grigorescu's leave required permission. *Id.* at 159.

In March, Mr. Whitlock issued a notice of suspension and termination for "misrepresenting her physical condition and abuse of leave privileges." *Id.* at ¶ 164. He stated she was absent from work without permission on six dates between January and March of 2016. *Id.* Again, a *Skelly* hearing was held before President Claire. *Id.* at ¶ 166. Again, President Claire supported the proposed termination, finding "there are reasonable grounds for believing that Ms. Grigorescu engaged in the alleged misconduct." Docket No. 101-2 at 76. And again, Ms. Grigorescu appealed President Claire's decision. Grigorescu Decl. ¶ 166.

On June 17 and July 21, 2016, her second termination appeal hearing (*Grigorescu II*) was held before the Board of Trustees. Whitlock Decl. ¶ 9. The presiding officer was Gina M. Roccanova, an attorney from an outside third party firm, Meyers Nave. Docket No. 101-2 at 475.

In this hearing, Ms. Grigorescu alleged that Mr. Whitlock retaliated against her for

protected speech and presented evidence that she participated in several protected activities which included protesting the elimination of a garden at the College.  Docket No. 101-2 at 1069-1070. She also asserted several other protected activities, including filing a workers' compensation claim and making a request for medical leave.  *Id.* at 1069.  She alleged that the district repeatedly retaliated against her in numerous ways, including by refusing to accommodate medical restrictions, proposing her termination that led to *Grigorescu I,* and that the second termination attempt that led to *Grigorescu II* was the "latest in this string of actions."  *Id.* at 491 (Transcript of Proceedings).  The string of actions included other retaliatory acts, including the District's denial of her request for a flexible schedule,  *Id.* at 491-2, and a refusal to allow her to attend regular meetings of a campus committee.  *Id.* at 1048 (CSEA Post-Hearing Closing Brief).

Ms. Roccanova found that while at least one of the activities was sufficiently close in time to her proposed dismissal to raise an initial inference of causation, "the strength of the District's evidence of her wrongdoing is sufficient to overcome any such inference."  Docket No. 101-2 at 1069-1070.  Ms. Roccanova recommended termination, writing:

> The District proved that Ms. Grigorescu improperly took paid leave from the District to work a second job with conflicting hours.  Her intentional disregard for the work schedule set for her by the District constitutes insubordination.  Ms. Grigorescu also abused her leave privileges, was absent from work without authorization, and improperly took leave from her District position to work at another job.  Most egregiously, she was intentionally deceptive about her reasons for taking time off.  Given her recent lengthy suspension for dishonesty, termination is appropriate.  *Id.* at 1061.

In December 2016, the Board of Trustees adopted Ms. Roccanova's recommendation and terminated Ms. Grigorescu.  Whitlock Decl. ¶ 9.

4.    Other Alleged Retaliatory Acts ("Harassment Actions")

Starting from when Mr. Whitlock assumed the VCHR position in July 2014, Ms. Grigorescu asserts she experienced numerous other retaliatory acts, herein "harassment actions," as follows:

In September 2014, Ms. Grigorescu was not permitted to participate in a mentorship program for African American students because she was white.  Grigorescu Decl. ¶ 90-91.  Mr.

1  Whitlock contests that she could participate during non-work hours, such as her lunch break.  Mot.

2  at 20; Docket No. 100-2 at 736 (Grigorescu Deposition 256:25 to 257:1-13).

3       That same month, Ms. Grigorescu raised the issue of a history of discrimination against her

4  by the District in a meeting with Dean Frontiera and a union representative.  Ms. Grigorescu's

5  meeting record states the following: "Charlene said if we're talking about discrimination, then the

6  meeting had to end right there and be continued in the presence of Eugene Whitlock."  Docket No.

7  100-2 at 872.  Ms. Grigorescu asserts that Frontiera was directed by Mr. Whitlock "to proceed as

8  she did."  Grigorescu Decl. at ¶ 93.  Mr. Whitlock contests that Dean Frontiera was not acting

9  under Mr. Whitlock's direction, and the meeting record does not show otherwise.  Mot. at 22;

10  Docket No. 100-2 at 870 (Morrison Decl. Ex. 7, 390:3-23).[1]  There is no evidence nor allegations

11  that up until that 2014 meeting, Mr. Whitlock engaged in discrimination on his own.

12       Around the same time, Dean Frontiera banned Ms. Grigorescu from substituting for full

13  time professors.  Grigorescu Decl. at ¶ 94.  Dean Frontiera also filed an incorrect teaching

14  evaluation.  *Id.* at ¶ 96.

15       Next, in 2015, Mr. Whitlock failed to provide workplace disability accommodations and

16  required her to take a leave of absence after experiencing physical health issues.  Grigorescu Decl.

17  at ¶ 110-11.  According to Ms. Grigorescu, she requested accommodations from him directly in a

18  face-to-face meeting.  Morrison Decl. at 811.  Mr. Whitlock contends that he was not involved

19  with nor did he know about workplace accommodation requests because they were handled by the

20  workers compensation employee, Ingrid Melgoza.  Mot. at 21; Morrison Decl. at 811-12.

21       In 2016, Ms. Grigorescu states that "Whitlock shouted I was a bad employee, who only

22  causes problems, and that he wanted to never hear my name again."  Grigorescu Decl. at ¶ 142.

23       She also was not given teaching assignments throughout the year.  *Id.* at ¶¶146, 169.

24  

---

25  [1]    "So I may have not included those particular words in my account… they may not have
been uttered in this particular format, but that was the sentiment that transpired via body language,
26  via half-word sentences, half sentences uttered that Charlene … said "I've done what I've been
told to do," or "I'm taking my orders from HR." And perhaps somebody said, "Who's HR?" And
she might have said, "vice chancellor."
27      I did not record the meeting.  I wish I did. .. so I paraphrased after the meeting, to the best
of my knowledge… to the best of my memory and trying to be as specific as I could."  Docket No.
28  100-2 at 869-870 (Grigorescu Deposition, Morrison Decl. Ex. 7, 389:15-25 to 390:1-2).

1     Lastly, the denial of her request for a four-day a week schedule request by Mr. Whitlock and Dean

2     Frontiera, which resulted in *Grigorescu II*, is an alleged adverse action.  *Id.* at ¶ 148.

3     B.     Procedural Background

4            In this suit, Ms. Grigorescu asserted claims against the District as well as various

5     supervisors in their individual capacity.  *See* Docket No. 1.  This Court previously dismissed the

6     claims against Dean Frontiera because Ms. Grigorescu failed to provide facts to connect Dean

7     Frontiera's actions to Ms. Grigorescu's involvement in the environmental lawsuit.  Docket No. 38

8     (Order Granting in Part and Denying In Part D's Mot. to Dismiss).  After previously dismissing

9     Ms. Grigorescu's first amended complaint with leave to amend, the Court permitted Ms.

10    Grigorescu to plead two claims solely against Mr. Whitlock: (1) race-based termination under 42

11    U.S.C. § 1981; and (2) retaliatory harassment for exercise of First Amendment rights claims under

12    42 U.S.C. § 1983.  Docket No. 38 at 14 (Order Granting in Part and Denying in Part D's Motion to

13    Dismiss).

14           On September 30, 2019, Ms. Grigorescu filed her TAC.  Docket No. 39.  In addition to

15    causing her termination, Mr. Grigorescu alleges a variety of harassment she suffered.  The TAC

16    lists the following:

17

18           Over time, beginning in 2011, and continuously thereafter, the
             District engaged in a continuous pattern of discriminatory and
19           retaliatory conduct towards Violeta. Eugene Whitlock was the
             dominant actor in efforts to undermine and retaliate against Violeta,
20           which included, but was not limited to: (a) attempts to coerce her to
             end her employment with the District and resign; (b)  refusals to
21           accommodate Violeta's physical and emotional disabilities; (c)
             engaging in a course of conduct aimed at depriving Violeta of
22           promotional opportunity; (d) erroneously claiming Violeta was
             ineligible for a full-time tenure track physics instructor for
23           pretextual reasons, then retracting or recanting their assertions, then
             going through the motion of a belated but hostile job interview; (e)
24           despite Violeta's superior credentials and experience, giving the
             position to a much younger male of a different racial background or
25           national origin; (f) on four or more occasions suspending Violeta's
             employment without good cause, based on false accusations of
26           dishonesty and other false accusations; (g) numerous attempts to
             terminate Violeta's classified lab tech position; (h)  failing to
27           comply with Violeta's preferential rights as a certified instructor;

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | TAC ¶ 5.  Mr. Whitlock moved to dismiss the TAC.  Docket No. 41. On December 23, 2019, this

2 | Court partially granted Mr. Whitlock's Motion to Dismiss, dismissing with prejudice Ms.

3 | Grigorescu's claim (1) race-based termination under 42 U.S.C. § 1981.  Docket No. 52 at 15.  The

4 | only remaining claim is (2) Retaliatory Harassment for Exercise of First Amendment Rights (42

5 | U.S.C. § 1983).  Ms. Grigorescu alleges that Mr. Whitlock retaliated and harassed Ms. Grigorescu

6 | for engaging in protected speech activity concerning CSM garden demolition to construct a

7 | parking lot.  TAC ¶ 97.

8 |      On June 14, 2023, Defendant moved for summary judgment on the only remaining claim

9 | (2) Retaliatory Harassment for Exercise of First Amendment Rights (42 U.S.C. § 1983).

10 | Defendant's Motion for Summary Judgment ("Mot.") Docket No. 100 at 1.  This is the sole

11 | motion currently pending before the court.  For the reasons discussed below, the Court GRANTS

12 | in part and DENIES in part the Defendant's Motion for Summary Judgment.

### III.    DISCUSSION

A.    Legal Standard

     Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.[2]

---

[2] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.,* 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'"). An evidentiary objection during summary judgment "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented

B.    <u>Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).   First Amendment Retaliation</u>

A plaintiff may assert a 42 U.S.C. § 1983 claim where they allege retaliation by state actors for exercising their First Amendment rights.  *See Mt. Healthy City Sch. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 283–84 (1977).  In a First Amendment retaliation claim against a government employer on summary judgment, courts conduct a five-step inquiry into the following questions:

> (1) Whether the speech at issue was a matter of public concern; (2) whether the plaintiff spoke as a private citizen or a public employee; (3) whether the speech was a substantial or motivating factor in the adverse employment action; (4) whether the state employer had an adequate justification for treating the employee differently from members of the general public; and (5) whether the state employer would have taken the adverse employment action even absent the speech.  *Eng v. Cooley*, 552 F.3d 1062, 1070 (citing *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1986)).

If the plaintiff succeeds in establishing the first three elements, the defendants bear the burden of either justifying the alleged adverse action by showing that its "legitimate administrative interests outweigh [plaintiff's] First Amendment rights," or establishing it would have made the same decision regardless of the protected conduct.  *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004).

1.    <u>Speech as a Citizen on a Matter of Public Concern</u>

When establishing a First Amendment retaliation claim, "the plaintiff bears the burden of showing that the speech addressed an issue of public concern."  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  Further, the First Amendment protects speech made as a private citizen "relating to any matter of political, social, or other concern to the community," as opposed to

---

or to explain the admissible form that is anticipated." Fed.R.Civ.P. 56(c)(2) advisory committee's note to 2010 amendment; *Lizarraga-Davis v. Transworld Sys. Inc.*, No. 18-CV-04081-BLF, 2022 WL 4485813, at *2 (N.D. Cal. Sept. 27, 2022) ("[O]nce [plaintiff] raised a hearsay objection, the burden was on [defendant] to either show that the [evidence] was admissible as presented or explain how the information contained therein could be presented in admissible form.").

United States District Court
Northern District of California

1  speech by an employee about matters of personal interest.  *See CarePartners, LLC v. Lashway,*

2  545 F.3d 867, 880 (9th Cir. 2008) (citing *Connick,* 461 U.S. at 146–48).  The inquiry is purely a

3  question of law.  *Eng*, 552 F.3d at 1070.

4  In *Pickering v. Board of Education of Township High School District 205, Will County,*

5  391 U.S. 563 (1968)*,* the Supreme Court held that a Board of Education violated a teacher's first

6  amendment rights when they fired him after he sent a letter to the local newspaper criticizing the

7  board.  *Id.* at 574-575.  The teacher's letter criticized the Board's allocation of school funds, and

8  the Board and superintendent's methods, or lack thereof, of communicating to taxpayers.  *Id.* at

9  569-70.  The Court held that a school system's need for additional funds is a matter of legitimate

10 public concern, and that teachers are "members of a community most likely to have informed and

11 definite opinions" as to how funds for schools should be spent.  *Id.* at 571-72.  The Supreme Court

12 held that a teacher's exercise of his right to speak on issues of public importance could not be the

13 basis for his dismissal.  *Id.* at 574.  The state may not abuse its position as employer to stifle "the

14 First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters

15 of public interest."  *Id.* at 568.

16 Here, Ms. Grigorescu was speaking as a citizen on a matter of public interest, as opposed

17 to as an employee on a matter of personal interest because her speech was about publicly funded

18 projects.  Like the teacher in *Pickering* who critiqued the Board's misuse of school funds, Ms.

19 Grigorescu critiqued the District about misused funds to demolish the only garden on campus and

20 construct a parking lot.  She was involved in the "Save the CSM Garden" group and *Friends*

21 litigation against the District.  Grigorescu Decl. ¶¶ 40, 62.  Additionally, she provided updates at

22 various union meetings, organized a teach-in, and sent emails and individually communicated with

23 campus members regarding garden demolition opposition.  *Id.* at ¶ 67-70.  In May 2011, she made

24 comments at a District Board meeting and submitted a letter to the board expressing her

25 appreciation of the gardens and nature.  Morrison Decl. Exh. 6. pp. 124:21, 126:14-20.  Ms.

26 Grigorescu's speech opposing the construction of a parking lot on SMC's campus was a matter of

27 public interest because it involved public funds and public land instead of a matter of personal

28 interest, e.g., her personal employment with the District.  Ms. Grigorescu has met her initial

1   burden to show her speech was as a citizen, as opposed to an employee, and addressed an issue of

2   public concern.

3          The Defendant contends that Ms. Grigorescu was an anonymous participant of the *Friends*

4   litigation and that her comments to the Board were "mild in tone." Mot. at 11. However, Ms.

5   Grigorescu has sufficiently established evidence of her speech beyond the specific *Friends*

6   litigation because she was engaged in numerous organizing activities broadly related to saving the

7   CSM gardens. Further, her speech regarded a matter of public concern, regardless of her

8   tone. This is enough to establish the first element of a prima facie case for the First Amendment

9   retaliation claim.

10          As an initial matter, the Court will not consider any facts or claims relating to Ms.

11  Grigorescu's involvement writing a letter (the "Beliz Letter") that criticized CSM Chancellor Ron

12  Galatolo for his misuse of bond funds to build unnecessary campus projects. Opposition at 15.

13  This basis for alleged retaliation was not sufficiently asserted in her complaint and is effectively

14  raised for the first time in the context of summary judgment. At the summary judgment stage, the

15  proper procedure for plaintiff to assert new claim is to amend the complaint. Fed. R. Civ. Proc.

16  Rule 15, 28 U.S.C.A.(a). A plaintiff may not amend her complaint through argument in brief

17  opposing summary judgment. *Id; Pickern v. Pier 1 Imports (U.S.), Inc.,* 457 F.3d 963, 969 (9th

18  Cir. 2006) (affirming grant of summary judgment in favor of defendant where "the complaint gave

19  the Appellees no notice of the specific factual allegations presented for the first time in [plaintiff's]

20  opposition to summary judgment."). The TAC does not claim that her involvement in the Beliz

21  letter was part of her protected expression. Nowhere in the complaint does Ms. Grigorescu

22  mention a letter to Congresswoman Jackie Speier, nor that the letter was about Ron Holober, nor

23  any mention of any letter at all.

24          The Court will also not consider any claims relating to Galatolo for the same reason. Not

25  until her opposition of the instant motion did Ms. Grigorescu first allege that Mr. Whitlock was

26  "conspiratorial" with Galatolo, "act[ed] intentionally at the direction and orders of his boss," and

27  was part of Galatolo's "nefarious scheme." Opposition at 19. The TAC did not claim that

28  Galatolo directed the retaliation, or that Galatolo conspired with Mr. Whitlock to retaliate against

United States District Court
Northern District of California

13

1    Ms. Grigorescu.  Ms. Grigorescu never sought to amend her complaint to assert this new theory.

2    It thus will not be considered.

3              2.      Adverse Employment Action

4          Defendants now dispute that Ms. Grigorescu received adverse employment actions.  Mot.

5    at 28.  "In a First Amendment retaliation case, an adverse employment action is an act that is

6    reasonably likely to deter employees from engaging in constitutionally protected speech."

7    *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003).  To show this element, courts apply

8    the "reasonably likely to deter" test.  *Greisen v. Hanken,* 925 F.3d 1097, 1113 (9th Cir. 2019).  The

9    key question is whether the retaliatory activity "would 'chill or silence a person of ordinary

10   firmness' from continuing to speak out." *Blair v. Bethel Sch. Dist.,* 608 F.3d 540, 543 n.1 (9th Cir.

11   2010).  Further, "Various kinds of employment actions may have an impermissible chilling effect.

12   Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First

13   Amendment rights."  *Coszalter,* 320 F.3d at 975.

14         In *Coszalter,* the Ninth Circuit found that several unwarranted disciplinary investigations, a

15   reprimand containing a false accusation, a ten-day suspension from work, a threat of disciplinary

16   action, among numerous other actions, "when taken together... amounted to a severe and sustained

17   campaign" of retaliation that was "reasonably likely to deter" plaintiffs from engaging in speech

18   protected under the First Amendment.  *Coszalter*, 320 F.3d at 977.  In contrast, in *Nunez v. City of

19   Los Angeles,* 147 F.3d 867 (9th Cir. 1998), the plaintiff failed to prove his employer committed an

20   adverse action when they allegedly scolded and threatened to transfer or dismiss him.  *Id.* at 874.

21   In that case, the plaintiff objected to the practice of his employer, the Los Angeles Police

22   Department, in promoting unqualified applicants over himself.  *Id.* at 869.  The court found no

23   adverse action because "all he has shown is that he was bad-mouthed and verbally threatened."  *Id.*

24   at 875.  Further, he retained his job and did not provide any evidence that his failure to receive a

25   promotion was linked to his criticisms.  *Id.*

26              a.      First and Second Termination Attempts

27         Mr. Whitlock's attempts to terminate Ms. Grigorescu are like the adverse actions in

28   *Coszalter.*  After Mr. Whitlock assumed the VCHR position in 2014, he attempted to terminate her

United States District Court
Northern District of California

14

employment twice, once in 2015 and once in 2016.  The first time, he falsely accused her of intentionally misrepresenting her degree equivalency.  Just as the court in *Coszalter* found the actions were likely to deter when viewed in aggregate, here, Mr. Whitlock's two termination attempts could be seen as "severe and sustained campaign" of retaliation in the aggregate that is likely to deter an employee from engaging in protected speech in the future.  *See also Marable v. Nitchman,* 511 F.3d 924, 929 (9th Cir. 2007) (holding that Marable suffered adverse employment action because his employer accused him of misconduct, conducted a disciplinary hearing, and suspended him without pay, noting that "This is about as adverse as it gets.").  And unlike the low-level threats that did not amount to adverse action in *Nunez,* here, Mr. Whitlock initiated notices of termination and advocated for her termination at disciplinary hearings and appeal hearings.

In arguing that these actions are not adverse, Mr. Whitlock asserts that the purposes of his actions such as the apparent lack of degree equivalency for CSM job positions were legitimate and justified.  *See* Mot. at 17.  But the asserted justifications for adverse actions is not pertinent when evaluating the second element of a First Amendment retaliation claim.  This conflates two distinct issues—whether adverse actions were taken against the employee, and, if so, whether the actions were taken in retaliation against the employee's protected speech.  The only question here is whether the actions taken against Ms. Grigorescu are "reasonably likely to deter" protected expression.  We find that Mr. Whitlock's two attempts to terminate Ms. Grigorescu are a pattern of disciplinary actions that are likely to deter an employee from engaging in constitutionally protected speech.

> b.  Harassment actions

There is a genuine dispute of fact as to whether the numerous harassment actions, particularly when viewed in the aggregate, were adverse actions, including the ban from mentorship program participation, ban from substituting for full-time professors, filing of an incorrect teaching evaluation, denial of disability accommodations, assertion that Ms. Grigorescu was a "bad employee," suspension from teaching positions, and denial of teaching and scheduling requests.  *See* Grigorescu Decl. ¶¶ 91, 94, 96, 110, 112, 146, 148.  These harassment actions, especially when taken together, could be "reasonably likely to deter" an employee from engaging

1    in protected activity.  *See Coszalter* 320 F.3d at 976.  *See also Dahlia v. Rodriguez,* 735 F.3d

2    1060, 1079 (9th Cir. 2013) (finding placement on administrative leave is an adverse employment

3    action); *Brooks v. City of San Mateo,* 229 F.3d 917, 928–29 (9th Cir. 2000) (noting that

4    "termination, dissemination of a negative employment reference, issuance of an undeserved

5    negative performance review and refusal to consider for promotion" constitute adverse

6    employment actions, whereas "declining to hold a job open for an employee and badmouthing an

7    employee outside the job reference context" do not); *Fonseca v. Sysco Food Servs. of Ariz., Inc.,*

8    374 F.3d 840, 847 (9th Cir. 2004) ("an adverse employment action exists where an employer's

9    action negatively affects its employee's compensation."); *Ellins v. City of Sierra Madre*, 710 F.3d

10   1049, 1060–61 (C.A.9 (Cal.), 2013) (holding that even the denial of a minor financial benefit may

11   form the basis of a First Amendment claim.).

12        To be sure, Ms. Grigorescu did remain active in the *Friends* litigation throughout the

13   alleged pattern of adverse actions and seemed to remain undeterred.  In 2016, she attended a

14   *Friends* hearing before the California Supreme Court.  Grigorescu Decl. ¶ 78.  Then, in 2017 when

15   the case was remanded, she attended the hearing before the California Court of Appeal.  *Id.*  Both

16   *Friends* hearings took place after her first termination attempt, and she attended the second one

17   after her full termination from employment.  However, while her continued involvement in

18   protected speech activity is probative of an adverse action determination, it is not dispositive.  The

19   test is whether the adverse action is sufficient to deter "a reasonable employee" from engaging in

20   protected speech, not Ms. Grigorescu specifically.  *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1079

21   (9th Cir. 2013).  There is therefore a genuine dispute of fact as to whether the harassment actions

22   are adverse employment actions.

23        3.    Preclusive Effect

24        Defendants argue that preclusion bars Ms. Grigorescu from litigating her First Amendment

25   retaliation claim.  Mot. at 31.  An unreviewed state administrative decision may have preclusive

26   effect in federal court as a matter of federal common law, as long as they meet the fairness

27   requirements described in *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394 (1966).

28   *Miller v. Cnty. of Santa Cruz*, 39 F.3d 1030, 1032 (9th Cir. 1994); *see also Alarcon v. Bostic,* 2018

United States District Court
Northern District of California

16

1    U.S. Dist. LEXIS 206363, *5 (S.D. Cal. 2018).  Furthermore, an unreviewed state administrative

2    decision has preclusive effect when a state agency is "acting in a judicial capacity" and "resolves

3    disputed issues of fact properly before it which the parties have had an adequate opportunity to

4    litigate."  *University of Tennessee v. Elliot*, 487 U.S. 788, 799 (1986).

5         Under *Utah Construction*, it is fair to give preclusive effect to an administrative decision if

6    (1) the administrative agency acted in a judicial capacity; (2) the agency "resolv[ed] disputed

7    issues of fact properly before it;" and (3) "the parties . . . had an adequate opportunity to

8    litigate." *Utah Constr.*, 384 U.S. at 422.  If an administrative proceeding is sufficiently judicial in

9    character under *Utah Construction*, federal courts turn to the state's rules of preclusion to define

10   the preclusive effect of the administrative decision.  *White v. City of Pasadena*, 671 F.3d 918, 926

11   (9th Cir. 2012); *Eaton v. Siemens*, No. 2:07-CV-00315-MCE-CKD, 2012 U.S. Dist. LEXIS 68757,

12   2012 WL 1669680, at *5 (E.D. Cal. 2012), *aff'd*, 571 Fed. App'x 620 (9th Cir. 2014).

13        Here, the administrative proceeding in *Grigorescu II* was sufficiently judicial in character

14   to be afforded potential preclusive effect.  Ms. Grigorescu agreed to the hearing officer, was

15   represented by her union counsel, made opening and closing statements, introduced evidence,

16   examined and cross-examined witnesses at the hearing, and submitted post-hearing briefs.

17   *Grigorescu II* has a full hearing transcript.  Further, the hearing officer issued a written decision on

18   the merits denying Ms. Grigorescu's appeal.  Therefore, the administrative decision concerning

19   whether the final termination attempt was an adverse action meets the requirements in *Utah*

20   *Construction* and may be given preclusive effect.  *See Miller*, 39 F.3d at 1032-38 (holding that an

21   unreviewed administrative determination can meet the *Utah Construction* fairness requirements);

22   *Alarcon v. Bostic*, 2018 U.S. Dist. LEXIS 206363 at *2-3, 6-7 (finding that the administrative

23   proceeding regarding the plaintiff's appeal of the city's termination of his employment may have

24   preclusive effect because the hearing had an agreed-upon presiding hearing officer, representation

25   by counsel, opening statements and arguments, documentary evidence, examination and cross-

26   examination of witnesses, post-hearing briefs, and a written final decision from the hearing

27   officer.).

28              a.    Claim Preclusion

Claim preclusion, or res judicata, dictates that "'a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"  *White*, 671 F.3d at 926 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008)).  In other words, "[r]es judicata bars the litigation not only of issues that were actually litigated but also issues that *could have been* litigated." *See Fed'n of Hillside & Canyon Ass'ns v. City of Los Angeles*, 126 Cal. App. 4th 1180, 1202, 24 Cal. Rptr. 3d 543 (Ct. App. 2004) (emphasis added).

Under California law, two proceedings address the same claim if they arise out of the same "primary right," which is "the right to be free from a particular injury, regardless of the legal theory on which liability for the injury is based." *Id.*  In addition to identity of claims, in order for res judicata to apply, "the decision in the prior proceeding [must be] final and on the merits" and "the parties in the present proceeding or parties in privity with them were parties to the prior proceeding." *Id.*; *see Cell Therapeutics, Inc. v. Lash Group, Inc.*, 586 F.3d 1204, 1212 (9th Cir. 2009).

In *Alarcon v. Bostic,* the court precluded the plaintiffs from raising a first amendment retaliation claim against an employer, because the same primary right of the right to employment was at stake in the current case and the prior underlying administrative proceeding.  2018 U.S. Dist. LEXIS 206363 at *11.  In that case, the city terminated both plaintiffs, and the plaintiffs exercised their rights to an administrative appeal.  *Id.* at *9.  Importantly, the hearing officer specified that the issue was whether there was just cause for termination.  *Id.* at *10.  In the case before the court, plaintiffs again asserted wrongful termination, but contended they were terminated in retaliation for exercising their First Amendment rights.  *Id.* at *10.  The court explained:

> Specifically, in both the underlying administrative appeals and the instant action, the MSJ Plaintiffs allege that they were wrongfully terminated. In other words, the harm for which the MSJ Plaintiffs seek redress for here is identical to the harm at issue in the underlying administrative proceedings—loss of employment.[3]

---

[3] The Court pointed to ample supporting caselaw.  "*See Eaton*, 2012 U.S. Dist. LEXIS 68757, 2012 WL 1669680, at *6 (finding a prior arbitrator's decision barred the plaintiff's § 1983 action

*Id.* at *11-12.

In *Pedrina v. Chun*, 97 F.3d 1296, 1302 (9ᵗʰ Cir. 1996), corporate officers named in a RICO action were in privity with the corporation that was party to earlier action, because officers allegedly participated in the same wrongdoing that the corporation was accused of in the earlier action. *Id.*  The court noted, "The fact that certain of those defendants are being sued in their individual capacities does not weigh against a finding of privity with the corporation, as the allegations against them relate to actions taken in their official, rather than their individual, capacities." *Id.*  The court affirmed dismissal of the claim after finding that the claims in the prior suit were identical and reached a final judgment on the merits.  *Id.* at 1302-03.[4]  Under claim preclusion, plaintiffs were precluded from raising the same claim against the corporate officers. *Id.*

Here, the administrative appeal hearing in *Grigorescu II* is substantially similar to the underlying administrative proceeding that was preclusive in *Alarcon.*  Ms. Grigorescu's central allegation in both the *Skelly* appeal hearing and the case at bar was wrongful retaliatory termination.  She seeks to address the harm of loss of employment in both cases. In addition, *Grigorescu II* was a final decision on the merits.  As noted previously, the hearing officer issued a final written judgment that ruled on whether the final termination attempt was an adverse action in retaliation for Ms. Grigorescu's protected speech activity.  The officer concluded that "the strength of the District's evidence of her wrongdoing is sufficient to overcome any such inference."

based on the Equal Protection Clause because "[w]hile [the] [p]laintiff has presented the court with a new *theory* for recovery by invoking the equal protection clause and [§] 1983, he has not alleged a new harm," and "[a]s such, California's doctrine of *res judicata* precludes [the] [p]laintiff's present [§] 1983 action"); *Miller*, 39 F.3d at 1034-35 (finding that an agency's [*12] decision to sustain the County Sheriff's Department's termination of the plaintiff precluded the plaintiff's § 1983 action because the plaintiff only restated his wrongful termination contentions in constitutional terms); *Swartzendruber v. City of San Diego*, 3 Cal. App. 4th 896, 908, 5 Cal. Rptr. 2d 64 (Ct. App. 1992) (giving preclusive effect to the unreviewed findings of an administrative agency upholding the plaintiff's termination for disobeying a direct order to appear to work in a uniform because the plaintiff's allegations of federal civil rights violations only restated her cause of action for wrongful termination in constitutional terms and finding that the same primary right—the right to continued employment—was at stake in both actions)." Alarcon v. Bostic, No. 15cv1606-MMA (RBM), 2018 U.S. Dist. LEXIS 206363, at *11-12 (S.D. Cal. Dec. 6, 2018)
[4] In this case, res judicata elements were analyzed under Hawaii state preclusion law.  *Id.* at 1302-03.

United States District Court
Northern District of California

1   Docket No. 101-2 at 1069-1070.

2         Lastly, to the privity element, Mr. Whitlock has privity with the District in the earlier suit.

3   While he was not a party in the earlier litigation, he was involved in his official capacity as

4   General Counsel and VCHR.  Like the officer defendants in *Pedrina,* Mr. Whitlock is being

5   accused of the same wrongdoing that the District was charged with in the *Skelly* appeal hearing.

6   Also similarly, here, the allegations against Mr. Whitlock relate to actions taken in his official,

7   rather than his individual, capacity because the actions are related to Ms. Grigorescu's

8   employment at the District.  Just as the plaintiffs were precluded from raising the same claim

9   against corporate officers in *Pedrina,* here, Ms. Grigorescu is precluded from raising the same

10  claim against Mr. Whitlock.

11        Therefore, all of the elements of res judicata are met for *Grigorescu II* to have preclusive

12  effect on the claim Mr. Whitlock's final termination attempt was in retaliation for Ms.

13  Grigorescu's protected speech activity.

14                    b.      Issue Preclusion

15        Collateral estoppel, also known as issue preclusion, "bars the relitigation of issues actually

16  adjudicated in previous litigation."  *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019).  For

17  issue preclusion to apply, four conditions must be met: "(1) the issue at stake was identical in both

18  proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was

19  a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits.

20  *Id.*

21        Here, for the same reasons as above, the final termination appeal hearing meets all three

22  elements of issue preclusion to preclude Ms. Grigorescu's first amendment retaliation claim.  The

23  issue of first amendment retaliation is identical to that in the earlier suit.  Docket No. 101-2 at

24  1069-70.  Second, *Grigorescu II* reached a final judgment on the merits, and thus the issue was

25  actually litigated and decided.  Third, there was a full and fair opportunity to litigate the issue

26  given the sufficiently judicial character of the hearing.  Fourth, the issue was necessary to decide

27  the merits of the case as it was determinative of just cause for termination.

28        Therefore, the second administrative hearing has preclusive effect here both under claim

United States District Court
Northern District of California

1    preclusion and issue preclusion.  *See University of Tennessee,* 487 U.S. at 799.

2                    c.    First Termination Attempt and Harassment Actions

3        While Ms. Grigorescu is precluded from claiming that the second termination attempt was

4    retaliatory and wrongful, she is not precluded from claiming that the first termination attempt and

5    the other harassment actions were retaliatory.  Neither of those claims were previously litigated to

6    a final judgment in the prior administrative proceedings.  Therefore, the question of whether the

7    first termination attempt and the harassment actions were retaliatory proceed to an analysis of

8    causation.

9            4.    Causation

10       The critical question is whether a genuine dispute of fact exists as to whether Ms.

11   Grigorescu's protected expression was a "substantial or motivating factor" for the first termination

12   attempt and the harassment actions.  *See Coszalter*, 320 F.3d at 973.  To establish this element, the

13   plaintiff must first produce evidence that her employer knew of her speech.  *See Keyser v.*

14   *Sacramanto City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001).  Without such knowledge,

15   there can be no intent to retaliate.

16       After proving knowledge, the plaintiff must demonstrate that the retaliation caused adverse

17   action.  In the absence of direct evidence, circumstantial evidence can establish an inference of

18   retaliatory intent.  *Keyser v. Sacramento City Unified Sch. Dist.,* 265 F.3d 741, 752 (9th Cir. 2001).

19   The plaintiff can produce evidence of one of the following three: proximity in time of the

20   retaliation to the speech, employer opposition to the speech, or the employer's proffered

21   explanations for adverse employment action were pretextual.  *Id.* at 751-52.

22                    a.    Knowledge of protected speech

23       Mr. Whitlock states he had no knowledge of or communication with Ms. Grigorescu and

24   did not interact with her prior to his employment with the District in 2014.  Docket No. 101 at 2

25   ("Whitlock Decl.").  He also states he did not know the names of the individuals involved in the

26   *Friends* litigation.  Whitlock Deposition 197:16-23.

27       However, Ms. Grigorescu meets her burden of raising a genuine issue of fact as to whether

28   Mr. Whitlock knew of her speech when viewing the evidence in the light most favorable to her,

United States District Court<br>Northern District of California

and drawing all reasonable inferences in her favor. *See Liberty Lobby*, 477 U.S. at 255. Since 2011, she was a leader of a group that opposed the demolition of the CSM gardens to build a parking lot. Grigorescu Decl. at 7. She organized students, solicited faculty letters, sent mass emails to the community, and made statements to public officials at public events advocating to save the gardens. *Id.* at 7-8, 13. She updated Dean Frontiera about the organizing efforts to save the gardens "almost daily." *Id.* at 7. She, along with other group leaders, had meetings with President Claire to discuss concerns about the parking lot construction. *Id.* at 9. She organized and participated in a public Garden-Teach-In. *Id.* at 12. She made a comment at a Board of Trustees meeting about the gardens. Morrison Decl. Exh. 6. pp. 124:21, 126:14-20.

During her activity in Friends and the *Friends* litigation, Mr. Whitlock acted as General Counsel for the District. One could reasonably infer from his advisory role that he was aware of her activism to save the gardens. Notably, the Board of Trustees did not support the group and wanted to continue "over the objections of students and local activists." *Id.* at 11-12. While Mr. Whitlock claims that his involvement in the *Friends* litigation was limited, he was an advisor to the District throughout the entire period of Ms. Grigorescu's activism, even prior to the litigation commencing. Ms. Grigorescu took a substantial number of public actions in support of the gardens that suggests District leadership was aware of her. In particular, her near daily conversations with Dean Frontiera, her meeting with President Claire, and various appearances before Board members, creates a reasonable inference that Mr. Whitlock "more likely than not" knew of her protected speech activity. *See* Grigorescu Decl. ¶ ¶ 41, 47, Morrison Decl. Exh. 6. pp. 124:21, 126:14-20. Furthermore, the evidence that Dean Frontiera was directed by Mr. Whitlock to "proceed as she did" and that any discussion about discrimination had to be "continued in [Mr. Whitlock's] presence" suggests that they were in communication about Ms. Grigorescu shortly after Mr. Whitlock became VCHR. *See* Docket No. 100-2 at 872; Grigorescu Decl. at ¶ 93.

a. Circumstantial evidence of causation

There is no direct evidence of Mr. Whitlock's intent to retaliate against Ms. Grigorescu. Therefore, the Court looks to circumstantial evidence showing an inference of causation under any one of the three ways identified in *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741,

1    752 (9th Cir. 2001).  These include (1) proximity in time of the retaliation to the speech, (2)

2    employer opposition to the speech, or (3) the employer's proffered explanations for adverse

3    employment action were pretextual.  *Id.* at 751-52.  *See e.g.  Coszalter v. City of Salem,* 320 F.3d

4    968, 977 (9th Cir. 2003), *Walker v. Clark Cnty*., 2010 WL 5437251 at *7 (D. Nev. 2010).  The

5    discussion below examines whether circumstantial evidence exists to show causation as to both

6    the first termination attempt and the harassment actions.

7                                          i.      Proximity in Time

8           The first termination attempt may not have been sufficiently proximate to Ms.

9    Grigorescu's protected speech activity because it occurred four years later.  *C.f. Coszalter*, 320

10   F.3d at 978 (rejecting a bright-line rule about timing of protected speech retaliation, but finding a

11   reasonable inference of retaliation in an adverse action taken between three and eight months after

12   the plaintiff's protected speech).  Ms. Grigorescu engaged in Friends activism publicly in 2011,

13   while Mr. Whitlock did not become VCHR of the District until 2014 and did not attempt to

14   terminate her until 2015 and 2016.  Nor does Ms. Grigorescu offer an explanation as to why Mr.

15   Whitlock would have waited over a year after he joined the District before attempting to terminate

16   her.

17          On the other hand, the harassment actions may have been sufficiently proximate in time to

18   Ms. Grigorescu's protected speech activity to show an inference of causation.  A continuous series

19   of harassment actions ensued only two months after Mr. Whitlock joined the District as VCHR in

20   July of 2014.  In September 2014, Ms. Grigorescu was denied participation in a mentorship

21   program, and had a meeting with Dean Frontiera about discrimination concerns where Dean

22   Frontiera said the conversation had to be in Mr. Whitlock's presence.  Grigorescu Decl. at ¶ 93.

23   These alleged harassment actions were frequent throughout the period between 2014 to 2016,

24   including: the ban from substituting for full-time professors, filing of an incorrect teaching

25   evaluation, denial of disability accommodations, assertion that Ms. Grigorescu was a "bad

26   employee," suspension from teaching positions, and denial of teaching and scheduling requests.

27   *See* Grigorescu Decl. ¶¶ 91, 94, 96, 110, 112, 146, 148.  Together, this continuous pattern of

28   harassment actions starting two months after Mr. Whitlock joined the district and ending at Ms.

United States District Court
Northern District of California

1    Grigorescu's termination, show proximity in time.

2        While these actions did not start to occur until three years after Mr. Grigorescu

3    commenced here protected activity in support of the garden, the delay can be explained by the fact

4    that Mr. Whitlock was not in position to initiate retaliation against her until he became VCHR of

5    the college in 2014.  The fact that the alleged harassment started soon after he assumed the

6    position of VCHR arguably establishes a degree of proximity sufficient to raise an inference of

7    retaliatory motive here.  While a delay of three years between the protected activity and the acts of

8    retaliation is beyond that generally recognized as proximate in retaliation cases, the sequence of

9    events here present unique circumstances.

10                    ii.    Opposition to protected speech

11        Secondly, there is a reasonable inference that Mr. Whitlock opposed her advocacy for the

12   garden given his role in the *Friends* litigation as General Counsel for the district.  His client was

13   the direct adversary of Ms. Grigorescu's advocacy group.  Although there is no evidence that he

14   expressed any personal view on the merits against Ms. Grigorescu's position regarding the

15   gardens, his adversarial role is sufficient to raise and inference which prevents summary judgment.

16   Likewise, although there is no direct evidence of Mr. Whitlock's knowledge of Ms. Grigorescu's

17   role in the litigation, her openly public role and leadership on the issue raise an inference of

18   knowledge, particularly when all reasonable inferences must be drawn in her favor at this juncture.

19                    iii.    Pretextual explanations

20        Finally, no evidence shows that the proffered explanations for the first termination attempt

21   or the other adverse actions were pretextual.  In *Grigorescu I* the hearing officer overturned

22   termination, but did find that "there was some evidence that would support the imposition of

23   discipline on [Ms. Grigorescu] for misrepresentation of her academic qualifications."  Docket No.

24   101-1 at 245.  Ms. Grigorescu then received a two-and-a-half-month unpaid suspension.  Docket

25   No. 101-2 at 489.  Undisputed evidence shows that Mr. Whitlock conducted a thorough

26   investigation into Ms. Grigorescu's degree equivalency, implying that he made a good faith

27   attempt to assess her qualifications.  Ms. Grigorescu does not show evidence that any of the other

28   adverse actions were pretextual.  Nevertheless, the claims that the first termination attempt and the

United States District Court
Northern District of California

1  other adverse actions were retaliatory survive summary judgment for the reasons stated above

2  concerning proximity in time and opposition to her protected activity.

3  C.      Qualified Immunity

4          Because the Court grants Mr. Whitlock's motion for summary judgment based on issue

5  preclusion, the Court declines to address qualified immunity.  *See* Mot. at 31.

6  D.      Procedural violations

7          Mr. Whitlock argues that Plaintiff's counsel committed substantial procedural errors.

8  Docket No. 129 at 17-18 (Reply).  To provide just a few examples, Ms. Grigorescu exceeded the

9  page limit for the Opposition, numerous citations are not provided in the appropriate form,

10  declarations and exhibits were untimely filed.  *Id.* at 19-35.  The Court agrees that Ms. Grigorescu

11  has committed numerous procedural violations and a significant number of inaccuracies exist

12  throughout her record.  However, these violations did not prejudice the Defendants as they did not

13  affect the outcome of the pending motions.  The Court rules against Ms. Grigorescu on the merits

14  rather than the procedural errors she allegedly committed.

## IV.    CONCLUSION

16          For the foregoing reasons, the Court GRANTS in part and DENIES in part the Defendant's

17  Motion for Summary Judgment.  The Court GRANTS Defendant summary judgment on the claim

18  that the final termination was in retaliation for Ms. Grigorescu's protected speech activity.  The

19  Court DENIES summary judgment on the claims that the first termination attempt and the

20  harassment actions between 2014 and 2016 were in retaliation for protected speech activity.

21          **IT IS SO ORDERED**.

22  Dated:

23

24

25                                            _____
                                              EDWARD M. CHEN
25                                            United States District Judge

26

27

28