UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIOLETA GRIGORESCU, | Case No. 18-cv-05932-EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION FOR RECONSIDERATION ON SUMMARY JUDGMENT AND DENYING MOTION FOR JUDGMENT ON THE PLEADINGS** |
| BOARD OF TRUSTEES OF THE SAN MATEO COUNTY COMMUNITY COLLEGE DISTRICT, et al., | |
| Defendants. | Docket No. 143, 144 |

## I.    <u>INTRODUCTION</u>

This case involves a community college employee who sued the district for First Amendment retaliation.  The instant motion follows the Court's ruling on summary judgment. Plaintiff Violeta Grigorescu ("Ms. Grigorescu") was a former lab technician and adjunct professor at the College of San Mateo and the San Mateo Community College District ("District").  Ms. Grigorescu was involved in an environmental organizing group and litigation against the District that opposed the demolition of a campus garden to construct an additional parking lot ("Friends litigation").  As the litigation was ongoing, the District and Ms. Grigorescu had a series of employment disputes involving degree qualifications for teaching and abuse of leave privileges. Defendant Eugene Whitlock ("Mr. Whitlock") was the Vice Chancellor for Human Resources for the District and General Counsel during the time many of these disputes took place.  Ultimately the District and Mr. Whitlock terminated Ms. Grigorescu for her work absences.  Plaintiff claims these actions were part of a retaliatory scheme against her because of her activism to preserve the garden.

The Court granted in part and denied in part summary judgment, and Defendant now

United States District Court
Northern District of California

moves for (1) reconsideration of three issues: qualified immunity, preclusion, and disability accommodations, and (2) judgment on the pleadings based on divestiture of jurisdiction pending appeal and statute of limitations for Section 1983 claims.

## II.     FACTS AND BACKGROUND

A.     Factual Background

The facts are incorporated from the Court's Order on Motion for Summary Judgment as follows.  *See* Docket No. 136.

1.     Speech Activity

In 2004, Ms. Grigorescu was employed by the District as a laboratory technician at the College of San Mateo ("CSM").  Docket No. 124 ¶ 20 (Grigorescu Decl.).  In 2008, she became a part-time, adjunct physics instructor at CSM.  *Id.* at ¶ 28.

Throughout 2011, Ms. Grigorescu participated in an environmental organizing group called "Friends of CSM Gardens" ("Friends") to oppose the conversion of a campus garden into a parking lot.  She spoke daily about what her group was doing to oppose the destruction of the gardens with Charlene Frontiera, the Dean of Math and Science ("Dean Frontiera").  *Id.* at ¶ 41.  Ms. Grigorescu created a PowerPoint, was a main organizer of a teach-in, gave updates at a union meeting, and sent emails and individually communicated with campus members regarding garden demolition opposition.  *Id*. at ¶¶ 67-70.  She and other leaders of Friends met with CSM President Mike Claire ("President Claire") to discuss concerns about the plan to build a parking lot.  *Id.* at ¶ 47. She made comments at a District Board of Trustees ("Board") meeting and submitted a letter to the Board expressing her appreciation of the gardens and nature.  Docket No. 100-2 at PDF 604 (Morrison Decl.).

In April 2011, Friends filed a lawsuit against the District opposing garden demolition.  *Id.* at ¶ 65-66.  In 2016, the California Supreme Court ultimately heard the case in *Friends of College of San Mateo Gardens v. San Mateo County Community College District,* 1 Cal.5th 937 (2016) ("*Friends*").  Ms. Grigorescu was also involved in a group called "Citizens for a Green San Mateo" that sued the District for the destruction of trees on campus in connection with multiple construction projects.  *Id.  See Citizens for a Green San Mateo v. San Mateo County Community*

2

1    *College District,* 226 Cal. App. 4th 1572 (Cal. Ct. App. 2014) ("*Citizens*").

2         During this time, Mr. Whitlock was a deputy attorney at the San Mateo County Counsel

3    and acted as General Counsel for various school districts and agencies in San Mateo County.

4    Docket No. 101 ¶ 3 (Whitlock Decl.).  He was assigned to both *Friends* and *Citizens*.  He

5    identified a firm with CEQA expertise to litigate the case, reviewed occasional pleadings, and

6    observed some court hearings.  *Id.* at ¶ 4.  Mr. Whitlock was not an attorney of record in the initial

7    *Friends* lawsuit in 2011, though he was an attorney of record in the California Supreme Court case

8    *Friends* and in the second case *Citizens*.  In July of 2014, Mr. Whitlock became the Vice

9    Chancellor of Human Resources (VCHR) at the District.  Grigorescu Decl. ¶ 90-91.

10                  a.    *Grigorescu I* First Termination Attempt

11         On March 18, 2015, Ms. Grigorescu applied for a full-time physics teaching position at

12    CSM.  *Id.* at ¶ 97.  Mr. Whitlock then informed Ms. Grigorescu that after a "routine check" he

13    found that she did not have the qualifications for the position, and that her claim of a master's

14    degree from the University of Bucharest contradicted the district's records.  *Id.* at ¶ 98.  State

15    regulation requires that applicants for college teaching positions have a Master's degree, or apply

16    for Equivalency.  Docket No. 100-2 at 96 (Grigorescu Responses to Interrogatories ¶15).

17    Equivalency requires 24 credits of graduate level coursework and is equivalent to possessing a

18    master's degree.  Docket No. 100-2 at 51 (Grigorescu Responses to Interrogatories at 4).  In 1986,

19    Ms. Grigorescu graduated with a "Diploma de Licentia" from the University of Bucharest after

20    three years of study of physics and mathematics and an additional year of specialty coursework

21    within physics.  Grigorescu Decl. ¶ 8.  There is a dispute about whether she has the equivalent of a

22    master's degree in the U.S. as she represented.

23         Mr. Whitlock hired an independent firm to conduct an equivalency evaluation for Ms.

24    Grigorescu.  Docket No. 100-2 at 1726-27 (Whitlock Deposition 200:24-25 to 201:1-6).  The firm

25    determined she had only a bachelor's degree.  *Id.*  Mr. Whitlock also called each of Ms.

26    Grigorescu's degree-granting institutions to verify the degree equivalency.  *Id.* at 201:24-25.

27    There is also a dispute about whether those institutions confirmed or denied her degree

28    equivalency.  Ms. Grigorescu provided Mr. Whitlock with a document from the Minister of

Education at the University of Bucharest that attested that a "Diploma de Licenta" was equivalent to a master's degree in physics. Docket No. 100-2 at 1745 (Whitlock Deposition Part II at 219). Mr. Whitlock contests that the document was from an unknown organization which was not associated with the university where Ms. Grigorescu received her degree. Docket No. 100-2 at 1746 (Whitlock Deposition Part II at 220).

Mr. Whitlock then required her to submit a form to apply for equivalency to be a candidate for the position. Grigorescu Decl. ¶ 103. She then submitted a form. She interviewed but ultimately was not chosen for the position. *Id.* at ¶ 116.

Also at this time in April 2015, the District banned Ms. Grigorescu from both her lab tech and teaching positions on the basis of a flaring up of chronic pain as a result of excessive stress from obtaining equivalency statements. *Id.* at ¶ 110. Ms. Grigorescu was instructed to take a leave of absence from both positions "based on my alleged inability to bend to unlock a cabinet." *Id.* at ¶ 111-12; Frontiera Deposition 161:19. As a result of a meeting with Ms. Grigorescu's union representatives, Dean Frontiera allowed Ms. Grigorescu to conduct only the lecture portion of the physics class. Grigorescu Decl. ¶ 112.

On Thursday, May 28, 2015, Mr. Whitlock held a pre-disciplinary meeting regarding her equivalency. Docket No. 100-2 ¶ 81 (Grigorescu Supplemental Amended Responses to Whitlock Interrogatories) ("Grigorescu Responses"). On June 9, Mr. Whitlock served Ms. Grigorescu an official notice of termination and suspension without pay, charging her with misrepresentation of credentials and a pattern of lying about her degrees. *Id.* at ¶ 85.

On June 17, 2015, a *Skelly* hearing took place before President of CSM Mike Claire ("President Claire"). Grigorescu Decl. ¶ 124. A *Skelly* hearing is a pre-disciplinary procedure that allows public employees to challenge proposed disciplinary actions by their employer before those actions are finalized. *See Skelly v. State Personnel Board,* 15 Cal.3d 194, 194 (1975). It ensures that the employee has due process rights. Ms. Grigorescu and Mr. Whitlock were present. *Id.* The record does not reflect the precise issues raised in the hearing. At the end of the hearing, President Claire upheld Mr. Whitlock's recommendation for termination. *Id.*

In July, Ms. Grigorescu appealed, resulting in *Grigorescu I. See id.* at ¶ 126. The appeal

United States District Court
Northern District of California

hearing was held before the Board of Trustees with presiding officer Kathy Meola.  Whitlock Decl. ¶ 8.  Meola was a Chief Deputy at San Mateo County Counsel.  Docket No. 101-1 at 244.  Crucially, between the first and second days of the hearing, the District submitted a new letter it received from the University of Bucharest confirming that Ms. Grigorescu's bachelor's diploma was equivalent to a master's diploma.  *Id.* at 252.

On August 6, 2015, Meola ruled that the District did not meet its burden of proof to show that Ms. Grigorescu was dishonest in stating that her degree was equivalent to a master's degree.  Docket No. 101-1 at 249 (Whitlock Decl. Exh. 30).  Meola determined the following findings of fact:

> 3. Appellant acknowledged that while she did not receive two separate degrees from the University of Bucharest, she possessed one degree, which was equivalent to a bachelor's degree and a master's degree from the University of Bucharest, and Appellant attempted to show that equivalency on her resume by breaking the equivalency into two degrees.

*Id.* at 246. Further:

> 9. …In review of the evidence presented by both sides, it would have been more accurate for Appellant to list one degree on her resume and explain that her degree was equivalent to a bachelor's degree and a master's degree, but the evidence simply does not exist to show that Appellant lied or was dishonest in her representation that she had both a bachelor's degree and a master's degree from the University of Bucharest.  *Id.* at 248.

Meola also found that Ms. Grigorescu misrepresented that she had a minor in mathematics, because "Appellant admitted that she has no testimonial evidence to support her claim."  *Id.* at 248.  Further, Meola found that Ms. Grigorescu misrepresented that her Diploma de Baccalaureate was a bachelor's degree, as it was in fact her high-school diploma.  *Id.*  Meola rejected termination, but recommended discipline.  *Id.*  The Board accepted her recommendations and allowed Ms. Grigorescu to return to classified lab tech position.  *Id.* at 253-54.  She also received a two-and-a-half month unpaid suspension.  Docket No. 101-2 at 489.

       b.     <u>*Grigorescu II* Second Termination Attempt and Successful Termination</u>

In 2016, Mr. Whitlock made a final and ultimately successful attempt to terminate Ms. Grigorescu, resulting in *Grigorescu II*.

First, Ms. Grigorescu made several requests to take leave for doctor's appointments and

vacation days.  Grigorescu Decl. ¶¶ 137-39.  It is disputed that those requests were not submitted in a timely manner as required under her union contract.  *Id.*

Next, Ms. Grigorescu then requested a four-day per week lab tech schedule so she could teach at San Francisco State University on Fridays.  *Id.* at ¶¶ 142-48.  Dean Frontiera denied the request.  *Id.* at ¶ 148.  Dean Frontiera also denied a second request.  *Id.* at ¶ 153.  Ms. Grigorescu asserts that Dean Frontiera was "under orders" from Mr. Whitlock.  Docket No. 100-2 at 127 (Grigorescu Responses to Interrogatories ¶134).

Finally, a second series of disputes over Ms. Grigorescu's leave privilege ensued.  On Friday February 5, 2016, Ms. Grigorescu requested and was approved 5.5 hours of "sick time" for the same day, and used that time to teach at SFSU.  Grigorescu Decl. ¶ 156.  She then logged her leave as "personal necessity" time, which unlike "sick time," could be used at any time for any reason.  *See id.*  Two weeks later on Friday, February 19, Ms. Grigorescu notified Dean Frontiera she was using four hours of "personal necessity" time that same morning and would return to work in the afternoon.  *Id.* at ¶ 159.  Around noon, Dean Frontiera sent her a letter of suspension for missing work without permission.  *Id.*  It is disputed that Ms. Grigorescu's leave required permission.  *Id.* at 159.

In March, Mr. Whitlock issued a notice of suspension and termination for "misrepresenting her physical condition and abuse of leave privileges."  *Id.* at ¶ 164.  He stated she was absent from work without permission on six dates between January and March of 2016.  *Id.*  Again, a *Skelly* hearing was held before President Claire.  *Id.* at ¶ 166.  Again, President Claire supported the proposed termination, finding "there are reasonable grounds for believing that Ms. Grigorescu engaged in the alleged misconduct."  Docket No. 101-2 at 76.  And again, Ms. Grigorescu appealed President Claire's decision.  Grigorescu Decl. ¶ 166.

On June 17 and July 21, 2016, her second termination appeal hearing (*Grigorescu II*) was held before the Board of Trustees.  Whitlock Decl. ¶ 9.  The presiding officer was Gina M. Roccanova, an attorney from an outside third party firm, Meyers Nave.  Docket No. 101-2 at 475.

In this hearing, Ms. Grigorescu alleged that Mr. Whitlock retaliated against her for protected speech and presented evidence that she participated in several protected activities which

United States District Court
Northern District of California

included protesting the elimination of a garden at the College. *Id.* at 1069-1070. She also asserted several other protected activities, including filing a workers' compensation claim and making a request for medical leave. *Id.* at 1069. She alleged that the district repeatedly retaliated against her in numerous ways, including by refusing to accommodate medical restrictions, proposing her termination that led to *Grigorescu I,* and that the second termination attempt that led to *Grigorescu II* was the "latest in this string of actions." *Id.* at 491 (Transcript of Proceedings). The string of actions included other retaliatory acts, including the District's denial of her request for a flexible schedule, *Id.* at 491-2, and a refusal to allow her to attend regular meetings of a campus committee. *Id.* at 1048 (CSEA Post-Hearing Closing Brief).

Ms. Roccanova found that while at least one of the activities was sufficiently close in time to her proposed dismissal to raise an initial inference of causation, "the strength of the District's evidence of her wrongdoing is sufficient to overcome any such inference." Docket No. 101-2 at 1069-1070. Ms. Roccanova recommended termination, writing:

> The District proved that Ms. Grigorescu improperly took paid leave from the District to work a second job with conflicting hours. Her intentional disregard for the work schedule set for her by the District constitutes insubordination. Ms. Grigorescu also abused her leave privileges, was absent from work without authorization, and improperly took leave from her District position to work at another job. Most egregiously, she was intentionally deceptive about her reasons for taking time off. Given her recent lengthy suspension for dishonesty, termination is appropriate.

*Id.* at 1061. In December 2016, the Board of Trustees adopted the recommendation and terminated Ms. Grigorescu. Whitlock Decl. ¶ 9.

c.     Other "Harassment Actions"

Starting from when Mr. Whitlock assumed the VCHR position in July 2014, Ms. Grigorescu asserts she experienced numerous other retaliatory acts, herein "Harassment Actions," as follows:

In September 2014, Ms. Grigorescu was not permitted to participate in a mentorship program for African American students because she was white. Grigorescu Decl. ¶ 90-91. Mr. Whitlock contests that she could participate during non-work hours, such as her lunch break. Mot.

at 20; Docket No. 100-2 at 736 (Grigorescu Deposition 256:25 to 257:1-13).

That same month, Ms. Grigorescu raised the issue of a history of discrimination against her by the District in a meeting with Dean Frontiera and a union representative.  Ms. Grigorescu's meeting record states the following: "Charlene said if we're talking about discrimination, then the meeting had to end right there and be continued in the presence of Eugene Whitlock."  Docket No. 100-2 at 872.  Ms. Grigorescu asserts that Frontiera was directed by Mr. Whitlock "to proceed as she did."  Grigorescu Decl. at ¶ 93.  Mr. Whitlock contests that Dean Frontiera was not acting under Mr. Whitlock's direction, and the meeting record does not show otherwise.  Mot. at 22; Docket No. 100-2 at 870 (Morrison Decl. Ex. 7, 390:3-23).[1]  There is no evidence nor allegations that up until that 2014 meeting, Mr. Whitlock engaged in discrimination on his own.

Around the same time, Dean Frontiera banned Ms. Grigorescu from substituting for full time professors.  Grigorescu Decl. at ¶ 94.  Dean Frontiera also filed an incorrect teaching evaluation.  *Id.* at ¶ 96.

Next, in 2015, Mr. Whitlock failed to provide workplace disability accommodations and required her to take a leave of absence after experiencing physical health issues.  Grigorescu Decl. at ¶ 110-11.  According to Ms. Grigorescu, she requested accommodations from him directly in a face-to-face meeting.  Morrison Decl. at 811.  Mr. Whitlock contends that he was not involved with nor did he know about workplace accommodation requests because they were handled by the workers compensation employee, Ingrid Melgoza.  Mot. at 21; Morrison Decl. at 811-12.

In 2016, Ms. Grigorescu states that "Whitlock shouted I was a bad employee, who only causes problems, and that he wanted to never hear my name again."  Grigorescu Decl. at ¶ 142.  She also was not given teaching assignments throughout the year.  *Id.* at ¶¶146, 169.  Lastly, Mr. Whitlock and Dean Frontiera denied her request for a four-day a week schedule, which in part led

---

[1]    "So I may have not included those particular words in my account… they may not have been uttered in this particular format, but that was the sentiment that transpired via body language, via half-word sentences, half sentences uttered that Charlene … said "I've done what I've been told to do," or "I'm taking my orders from HR." And perhaps somebody said, "Who's HR?" And she might have said, "vice chancellor."
     I did not record the meeting.  I wish I did. .. so I paraphrased after the meeting, to the best of my knowledge… to the best of my memory and trying to be as specific as I could."  Docket No. 100-2 at 869-870 (Grigorescu Deposition, Morrison Decl. Ex. 7, 389:15-25 to 390:1-2).

to *Grigorescu II* and her final termination. *Id.* at ¶ 148.

B.     Procedural Background

1.     Prior State Court Proceeding

Relevant to the instant motion is the fact that on March 14, 2016, Plaintiff filed a Writ of Mandate in California Superior Court against Defendant and sought to reinstate her position with the District.  Docket No. 152-1 at PDF 5-9 (Exhibit A, Initial Petition for Writ of Mandate). There, she sought relief for the same conduct that forms the bases for her remaining First Amendment retaliation claim.  *Id.*  Note that the facts in the state court complaint also form the bases of her federal court complaint.  *See id.* at 59 (State Court Complaint and Writ of Mandate); Docket No. 39 (TAC).

On June 27, 2018, the Superior Court denied Plaintiff's writ of mandate.  *Id.* at 51-52 (Exhibit C, Notice of Ruling Denying Writ of Mandate).  Neither party attended the hearing, and the court ruled on the writ of mandate:

> DENIED.  Despite a Court-approved briefing schedule, the administrative record has not been lodged and no points and authorities or moving papers have been filed supporting the application for writ.

*Id.* at 54 (Petition for Writ of Mandate Minute Order).  Three months later, on September 27, 2018, Plaintiff filed her initial complaint in federal court (Docket No. 1).

2.     Summary Judgment

Defendant moved for summary judgment.  This Court held that Plaintiff was precluded from asserting the second termination attempt, *Grigorescu II,* as a basis for her First Amendment retaliation claim.  Docket No. 136 at 17-21 (Order on MSJ).  The Court held that *Grigorescu I* was an adverse action that was not precluded and can be relied on to form a basis for her retaliation claim.  The Court also held there was a genuine dispute of fact as to whether the other alleged retaliatory acts, the "Harassment Actions," constituted adverse actions. Order on MSJ at 21-25.

The Court did not rule on Defendant's claim of qualified immunity. *Id.* at 25.

### III.     MOTION FOR RECONSIDERATION

A.     Legal Standard

In the Ninth Circuit, a party may appropriately bring a motion for reconsideration of summary judgment under either Federal Rules of Civil Procedure Rule 59(e) or 60(b), even though Rule 60(b) governs only final judgments, orders, or proceedings.  *See Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1442 (9th Cir. 1991); Fed. R. Civ. Pro. 60(b).  A motion for reconsideration is treated as a motion under Federal Rule of Civil Procedure 59(e) if it is filed within 28 days of the judgment, and as a motion under Federal Rule of Civil Procedure 60(b) otherwise.  Fed. R. Civ. Pro. 59(e), 60(b); *Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898-99 (9th Cir. 2001).

Additionally, the local rules of this Court impose additional requirements on motions for reconsideration.  Motions for reconsideration under Local Rule 7-9 are appropriate only under three circumstances:

> (1) "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought;" (2) "the emergence of new material facts or a change of law occurring after the time of such order;" or (3) "a manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order."

Civ. Loc. R. 7-9(b)(1)–(3).

B.     Discussion

This Court granted Defendants leave to file a motion for reconsideration as to matters they believe were not addressed in the Court's Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment.  Docket No. 148 (Minute Entry). Defendant now moves to reconsider the following: (1) the Court should grant summary judgment to Defendant on qualified immunity, (2) the Court should have found that *Grigorescu I* has preclusive effect, and (3) the Court should not allow Defendant's failure to provide disability accommodations to make up part of the "Harassment Actions" that constitute an adverse action.

As an initial matter, Plaintiff argues that Defendant's motion for reconsideration fails to comply with Local Rule 7.9.  This argument lacks merit. The Court expressly permitted Defendant

United States District Court
Northern District of California

United States District Court
Northern District of California

1   to file a motion for reconsideration on substantive legal issues and thus compliance with the local

2   rules is implied; in particular, Defendant's motion is appropriate under Civ. Loc. R. 7-9(b)(3) ("a

3   manifest failure by the Court to consider … dispositive legal arguments which were presented to

4   the Court before such interlocutory order.").

5       1.   Qualified Immunity

6           a.   Rule 60(b)

7       Plaintiff argues that the Defendant cannot file this motion for reconsideration because Rule

8   60(b) only applies to final judgments, and not interlocutory rulings.  *Mateo v. M/S KISO,* 805 F.

9   Supp. 761, 786 (N.D. Cal. 1991).  It is generally true that Rules 59(e) and 60(b) do not govern

10  reconsideration of a denial of summary judgment, which normally is an interlocutory ruling.  *See*

11  *e.g., Portugues-Santa v. B. Fernandez Hermanos, Inc.,* 614 F. Supp. 2d 221 (D.P.R. 2009)

12  (holding that where former employee alleged race discrimination and employer's summary

13  judgment motion was denied, Fed. R. Civ. P. 59(e) and 60(b) did not apply to employer's motion

14  for reconsideration, because both rules applied only to final judgments and denial of summary

15  judgment motion did not dispose of employee's claims).

16          However, an exception exists if a court denies summary judgment on the issue of

17  qualified immunity.  "When the defendants are public officials asserting a qualified immunity

18  defense and the appealed issue is whether a given set of facts establishes that defendants violated

19  clearly established law," the order denying summary judgment is final and the appellate court has

20  jurisdiction under 28 U.S.C. § 1291.  *Bass v. Richards,* 308 F.3d at 1086 (10th Cir.

21  2002); *see Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of

22  qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision'

23  within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.")  Here,

24  the Court's denial of qualified immunity arguably concerns an issue of law.  Therefore, unless the

25  Ninth Circuit were to find otherwise, the order denying summary judgment on qualified immunity

26  is final for purposes of Rule 60(b).

27          b.   Rule 62.1(a)

28      Plaintiff contends that because Defendant first filed a notice of appeal, this court is

11

divested of jurisdiction for the motion for reconsideration.  *See Katzir's Floor & Home Design, Inc. v. M-MLS.com,* 394 F.3d 1143, 1148 (9th Cir. 2004).  However, if a timely motion is made for relief that the district court lacks authority to grant because of an appeal that has been docketed and is pending, the district court may:

- Defer consideration of the motion;
- Deny the motion; or
- State either that it would grant the motion if the court of appeals remands for that purpose, or that the motion raises a substantial issue.

Fed. R. Civ. Pro. 62.1(a).  The district court's suggestion for remand if it inclined to grant the motion is known as an "indicative ruling." *Id.* (Committee Note to the Original Rule).  However, no remand or permission of the court of appeals is necessary for the district court to deny the motion. Fed. R. Civ. P. 62.1(a)(1), (b); Fed. R. App. P. 12.1(a) (notice to court of appeals is required only if district court states that it would grant motion or that motion raises substantial issue).

Here, Defendant filed a notice of appeal prior to filing their motion for reconsideration. Therefore, Plaintiff is correct that the Court is divested of jurisdiction for the motion for reconsideration; however, Rule 62.1(a) applies. For the reasons stated below, the Court denies the motion for reconsideration of summary judgment on qualified immunity.  Therefore, the Court has jurisdiction to issue a direct, rather than indicative, ruling.

     c. <u>Merits of Qualified Immunity Defense</u>

Defendant makes two arguments to assert that he is entitled to qualified immunity.  First, his conduct was not barred by "clearly established" law at the time.  Motion for Reconsideration at 9.  Second, he reasonably believed his conduct was lawful.  *Id.*

"[T]o overcome qualified immunity, Plaintiffs must show that [defendants] (1) 'violated a federal statutory or constitutional right' and (2) 'the unlawfulness of their conduct was clearly established at the time.'" *Ballentine v. Tucker,* 28 F.4th 54, 61 (9th Cir. 2022).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

United States District Court
Northern District of California

i.    Clearly established law

It is clearly established that Ms. Grigorescu, as a public employee, cannot be retaliated against for exercising her First Amendment rights.  Public school employees have a clearly established First Amendment right to free speech, such as making statements at a public meeting on matters of public concern, and expression of political views.  In *Dodge v. Evergreen School District #114,* 56 F.4th 767 (9th Cir. 2022), a teacher alleged retaliation in violation of the First Amendment when a school principal told the teacher to not bring his Make America Great Again hat to teacher only trainings, and threatened the teacher with disciplinary action.  *Id.* at 772.  The Ninth Circuit denied the principal qualified immunity, stating that the plaintiff's "right to express political views, even as a public school teacher, is clearly established. That controversial political speech cannot be quelled because others may find the speech objectionable is clearly established." *Id.* at 787.; *see also Anderson v. Central Point School Dist. No. 6.,* 746 F.2d 505, 508 (9th Cir. 1984) (finding it was "clearly established" in March 1981 that teachers cannot be disciplined for exercising their first amendment rights); *Lewis v. Harrison School Dist. No. 1,* 805 F.2d 310 (8th Cir. 1986) (finding that school officials who fired a school employee for his statements at a public meeting were not protected by qualified immunity because the legal principle that school employees have rights to free speech was clearly established).

Similarly, here, Ms. Grigorescu has a clearly established right as a public school district employee to express her views against the demolition of a garden on school grounds.  This right for public employees to exercise their First Amendment rights has been clearly established for decades.  Defendant does not point to any nuance in the First Amendment principles that complicates the legal analysis here.  He does not contend, for instance, that the subject matter of Mr. Grigorescu was not within the ambit of her First Amendment right.  Therefore, Defendant cannot properly argue that retaliation against protected expression is not barred by clearly established law.  To the extent Defendant's motion for reconsideration of qualified immunity is based on this ground, it is denied.

ii.    Violation of a Constitutional Right

Next, Defendant argues that he did not violate a constitutional right because he reasonably

believed his conduct was lawful.  Motion at 9.  Ms. Grigorescu contests that he acted in retaliation for her protected speech, and therefore a factual dispute on this matter precludes qualified immunity.  *See* Opposition at 2.

Courts have found that although the qualified immunity test is generally characterized as objective, where the defendant's state of mind is an element of the underlying constitutional claim, it must be considered in the qualified immunity analysis.  *See e.g. Poe v. Haydon,* 853 F.2d 418, 431 (6th Cir. 1988) ("[W]e agree with those circuits that have recognized that a government official's motive or intent must be considered in the qualified immunity analysis, where unlawful motive or intent is a critical element of the substantive claim."); *Ratliff v. DeKalb County, Ga.,* 62 F.3d 338, 341 (11th Cir. 1995) ("in qualified immunity cases, intent is a relevant inquiry *if discriminatory intent is a specific element* of the constitutional tort." (emphasis in original));  *Elliott v. Thomas,* 937 F.2d 338 (7th Cir. 1991) (requiring that the plaintiff produce specific, nonconclusory factual allegations establishing the required mental state in cases where intent is one of the substantive elements of the constitutional claim); *Grant v. City of Pittsburgh,* 98 F.3d 116, 124 (3d Cir. 1996) ( "courts are not barred from examining evidence of a defendant's state of mind in considering whether the plaintiff has adduced sufficient evidence to withstand summary judgment on the issue of qualified immunity, where such state of mind is an essential element of the constitutional violation itself.").  If there are disputed issues of fact as to the requisite intent, the court may deny a motion for summary judgement based on qualified immunity.

In *Lindsey v. Shalmy,* 29 F.3d 1382, 1383-84 (9th Cir. 1994), the plaintiff sued a former supervisor for gender discrimination, and the supervisor argued he was entitled to qualified immunity.  The Ninth Circuit held that "It is clear, therefore, that some account must be taken of [the supervisor's] subjective intent in determining whether he is entitled to immunity." *Id.* at 1384.  It explained:

> [Defendant] would consequently remove from the inquiry all reference to his subjective state of mind or his motivation…The problem with this formulation, of course, is that it is nonsensical in relation to a constitutional tort that depends upon a subjective element, an invidiously discriminatory intent, for its very viability.

> If that element is left out of the test, then the official will always be immune in cases of alleged invidious discrimination. *See Martin v. District of Columbia Metro. Police Dep't,* 259 U.S. App. D.C. 31, 812 F.2d 1425, 1433 (D.C. Cir. 1987). Invariable immunity is not an acceptable result. *See id.*

*Id.* If "there is sufficient 'direct or circumstantial evidence' of intent…to create a genuine issue of fact for the jury," the court can deny summary judgment on the ground of immunity. *Id.* at 1385 (citation omitted). The court found significant evidence showing the supervisor's discriminatory motives, including past statements against women in the workplace and specific testimonies of disrespect and hostility towards female employees. *Id.* Therefore, there was sufficient direct or circumstantial evidence of discriminatory intent to defeat qualified immunity and thus denied summary judgement and allowed the matter to go to trial. *Id.*[2] *See Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir. 1996) (holding that if a plaintiff proffers particularized evidence of direct or circumstantial facts supporting the claim of an improper motive, it may avoid summary judgment based on qualified immunity, but granting summary judgment to the judge defendant because there was no evidence of retaliatory intent against his law clerk). In other words, where an unlawful intent is an essential element of the constitutional claim, there is, in effect, no independent qualified immunity defense that applies relative to that element.

Accordingly, the Court must consider Mr. Whitlock's state of mind when he allegedly undertook adverse actions against Ms. Grigorescu because it is an essential element of the First Amendment retaliation claim. *See Coszalter v. City of Salem,* 320 F.3d 968, 970 (9th Cir. 2203) (requiring that the plaintiff show retaliation was a "substantial or motivating factor" behind a defendant's adverse employment actions). Thus, if Ms. Grigorescu proffers sufficient evidence of direct or circumstantial facts which would establish a retaliatory motive, an essential element of her First Amendment claim, the Court must deny summary judgment based on qualified

---

[2] In *Gutierrez v. Municipal Court of Southeast Judicial Dist., Los Angeles County,* 838 F.2d 1031 (9th Cir. 1988), the Ninth Circuit held that "[W]here unlawful intent or motive is an essential element of the challenged conduct, the act cannot be analyzed apart from the actor's intent and the court *must* consider that intent in determining whether the defense of qualified immunity is available." *Id.* at 1050. The case was vacated and remanded to dismiss the appeal as moot. *Gutierrez v. Municipal Court of Southeast Judicial Dist., Los Angeles County,* 490 U.S. 1016 (1989). Nonetheless, *Gutierrez* is still frequently cited for its holding. *See, e.g., Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084, 1098 (N.D. Cal. 2005); *Rich v. Montpelier Supervisory Dist*, 167 Vt. 415, 424 (1998).

immunity.  *See Lindsey,* 29 F.3d at 1385; *Sheppard,* 94 F.3d at 828.

Here, weighing the evidence in the light most favorable to Ms. Grigorescu, she has raised a genuine dispute of fact as to whether Mr. Whitlock conducted *Grigorescu I* and the "Harassment Actions" with a retaliatory motive. This Court so concluded in its previous order denying summary judgment. Order on MSJ at 21.  First, there is an inference that Mr. Whitlock knew of Ms. Grigorescu's garden activism because of her leadership and public speech about the gardens, as well as her participation in the *Friends* litigation.  *See* Order on MSJ at 21-22.  Second, there is circumstantial evidence of causation because of the reasonable proximity in time between her activism and the "Harassment Actions," as well as the fact that Mr. Whitlock opposed her activism given his role as opposing counsel in the *Friends* litigation.  *Id.* at 22-24.  Unlike the clear evidence that showed the judge had no retaliatory intent in *Sheppard,* here the evidence shows a genuine dispute of fact of retaliatory intent.

Therefore, the Court denies summary judgment on qualified immunity as to both *Grigorescu I* and the Harassment Actions. *Cf. Burgess v. Pierce County,* 918 F.2d 104 (9th Cir. 1990) (qualified immunity on summary judgment grounds was inappropriate where there was a factual issue as to whether termination would have taken place regardless of constitutionally protected speech).

### 2.    Preclusion

Apart from the assertion of qualified immunity, Defendant seeks reconsideration on another basis for summary judgment—that *Grigorescu I* was litigated to a final judgment and therefore, like *Grigorescu II,* should have preclusive effect.[3]  Motion for Reconsideration at 9 n.1. For the reasons stated below, the Court denies this basis for reconsideration as well.

#### a.    Rule 54(b)

Under Rule 54(b), a court can review an interlocutory judgment at any time.  Fed. R. Civ. P. 54(b).  The Court's ruling on this issue remains interlocutory because unlike the denial of the motion for summary judgment on qualified immunity, the Court did not render a final judgment.

---

[3] The Court does not address the potential preclusive effect of *Grigorescu I* under res judicata based on the state court judgment on mandamus.  Defendant raised no such aargument.

United States District Court
Northern District of California

1    Thus, Rule 54(b), and not Rule 60(b) applies.[4]

2             b.    Utah Construction Requirements

3             An unreviewed state administrative decision may have preclusive effect in federal court as

4    a matter of federal common law, as long as they meet the fairness requirements described in

5    *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394 (1966).  *Miller v. Cnty. of Santa Cruz,*

6    39 F.3d 1030, 1032 (9th Cir. 1994).  It is fair to give preclusive effect to an administrative

7    decision if (1) the administrative agency acted in a judicial capacity; (2) the agency "resolv[ed]

8    disputed issues of fact properly before it;" and (3) "the parties . . . had an adequate opportunity to

9    litigate." *Utah Constr.,* 384 U.S. at 422.

10            *Wilson v. Oakland Unified Sch. Dist.,* 2024 U.S. Dist. LEXIS 43767 (N.D. Cal. 2024)

11   illustrates the application of the *Utah Construction* requirements.  There, a former school district

12   employee sued the district for first amendment retaliation, among other things, after he was

13   terminated for allegedly having inappropriate physical contact with one of the female students.  *Id.*

14   at *3.  The district held a *Skelly* hearing and upheld his termination.  *Id.*  This Court held that the

15   *Skelly* hearing satisfied the *Utah Construction* factors and therefore the parties were bound by

16   collateral estoppel and res judicata to the results of the "issues litigated."  *Id.* at *27.  As to the first

17   factor, the Court reviewed the record of the hearing and found it "clear" that the hearing officer

18   acted "in a judicial capacity." *Id.* at *23.  The plaintiff also had adequate notice of the hearing and

19   a clear opportunity to prepare oral statements and examinations, and the officer applied the facts to

20   the rule so as to make the proceeding "adjudicatory in nature." *Id.* at *24.  Second, the hearing

21   officer resolved disputed issues of fact given the hearing record and the officer's written statement

22   of reasons.  *Id.* Third, the fact the plaintiff's two union representatives were present and advocated

23   on his behalf at the hearing strongly supported a finding that parties had an adequate opportunity

24   to litigate.  *Id.* at *26.

25            Here, the *Utah Construction* factors are similarly met.  First, the hearing officer Meola

26

27   _____
     [4] Even if the denial of preclusion was deemed a final judgment since it was affected by the denial
28   of qualified immunity, and thus the Court was divested of jurisdiction on the issue, the Court still
     denies reconsideration of the motion under Rule 62.1(a).

United States District Court
Northern District of California

acted in a judicial capacity.  While she acknowledged her relationship to the District as Chief Deputy at San Mateo County Counsel, parties consented to her as the hearing officer, and the record shows that she was played a neutral role in the hearing.  *See* Docket No. 101-1 at PDF 196-7.  In fact, she disagreed with the District's view that Ms. Grigorescu intentionally misrepresented her credentials, and rejected the District's proposal of termination.  As in *Wilson,* she applied the rule to the facts, the hallmark of an "adjudicatory" proceeding.  Meola resolved disputed issues of fact and wrote a final recommendation.  Third, Ms. Grigorescu was given adequate notice of the hearing and opportunity to prepare statements and examinations of witnesses.   Fourth, Ms. Grigorescu's union representative advocated for her at the hearing which demonstrates that the parties had an adequate opportunity to litigate.  Therefore, *Grigorescu I* had sufficient indicia of fairness in order to have preclusive effect.

c.   <u>Preclusive effect</u>

If an administrative proceeding is sufficiently judicial in character under *Utah Construction,* federal courts turn to the state's rules of preclusion to define the preclusive effect of the administrative decision.  *White v. City of Pasadena,* 671 F.3d 918, 926 (9th Cir. 2012).  There are two types of preclusion: claim preclusion and issue preclusion.

i.   <u>Res Judicata</u>

Claim preclusion, or res judicata, dictates that "a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit."  *White*, 671 F.3d at 926 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).  Usually, res judicata or collateral estoppel is asserted by the party who prevailed in the first action to preclude or limit the second action.  Here, however, Ms. Grigorescu ultimately prevailed in *Grigorescu I* when Meola found she had the equivalent to a master's degree and did not misrepresent her credentials.  Although Defendant asserts res judicata, what is involved here is the branch of claim preclusion often referred to as "claim splitting."  *5th & LA v. Western Waterproofing Co., Inc.,* 87 Cal. App. 5th 781,788 (Cal. Ct. App. 2023).  In California, this doctrine precludes further proceedings if they are based on the same cause of action as the initial proceeding.  *Maldonado v. Harris*, 370 F.3d 945, 952 (9th Cir. 2004);  *Eichman v. Fotomat Corp.,* 759 F.2d 1434, 1438 (9th

Cir. 1985).  A cause of action is defined as (1) a primary right possessed by the plaintiff, (2) a corresponding primary duty devolving upon the defendant, and (3) a harm done by the defendant which consists in a breach of such primary right and duty."  *City of Martinez v. Texaco Trading & Transp., Inc.,* 353 F.3d 758, 762 (9th Cir. 2003), *citing Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Ass'n,* 60 Cal. App. 4th 1053, 1065, 71 Cal.Rptr.2d 77 (1998).  California courts consistently employ this test, known as the "primary rights" theory.  *Maldonado,* 370 F.3d 945, 952 (9th Cir. 2004) (citing *Mycogen Corp. v. Monsanto Co.,* 28 Cal. 4th 888, 904 (2002)).

As part of that analysis the court considers the harm suffered.  *Agarwal v. Johnson,* 25 Cal. 3d 932, 955 (1979) (overruled on other grounds by *White v. Ultramar, Inc.,* 21 Cal. 4th 563 (1979)).  "[I]f two actions involve the same injury to the plaintiff and the same wrong by the defendant, then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery."  *Eichman v. Fotomat Corp.,* 147 Cal. App. 3d  1170, 1174 (1983).

In *Miller v. County of Santa Cruz,* 39 F.3d 1030 (9th Cir. 1994), the plaintiff was terminated by Sheriff's Department after several disciplinary actions.  *Id.* at 1032.  He asserted wrongful termination throughout an administrative proceeding, which went unreviewed, and then sued the defendants in federal court under § 1983.  *Id.*  The Ninth Circuit held that the prior administrative proceeding had preclusive effect, and plaintiff could not relitigate whether his federal civil rights were violated.  *Id.* at 1034.  The court reasoned that "the same primary right, the right to continued employment, was at stake in both actions."  *Id.*  Thus, the plaintiff's alleged civil rights violations merely "restate[d] his wrongful termination contentions in constitutional terms."  *Id.* at 1034-35 (citation omitted).  Citing *Miller,* this Court found in the above-mentioned case, *Wilson v. Oakland Unified Sch. Dist.*, 2024 U.S. Dist. LEXIS 43767 (N.D. Cal. 2024), that the plaintiff's First Amendment claim was actually litigated at the *Skelly* hearing because the cause of action presented before the Court "encompasses the same primary right that was at stake in the [administrative] proceeding."  *Id.* at *27.  Like in *Miller,* the same primary right was his continued employment.  *Id.*  The Court noted that *Miller* was "directly applicable" and the plaintiff was barred from raising the claim in federal court.  *Wilson,* 2024 U.S. Dist. LEXIS 43767, at *27-28.

1          In *Takahashi v. Board of Trustees*, 783 F.2d 848 (9th Cir. 1986), the plaintiff teacher

2   brought an action in state court against the defendant school district, seeking reinstatement of her

3   job.  *Id.* at 848.  After a hearing, the district terminated her for failing to maintain a suitable

4   learning environment in her classroom.  *Id.* at 849.  She pursued proceedings at the state trial and

5   appellate court levels, and received adverse judgments from both.  *Id.*  Finally, she brought an

6   action in federal district court, this time alleging that her termination violated her rights under the

7   Fourteenth Amendment by terminating her on account of her sex and ethnic origin, *inter alia.  Id.*

8   The court held that both the prior actions and the present one, "the identical primary right – the

9   contractual right to employment – is at stake."  *Id.* at 851.  The court further explained that "In

10  determining the primary right at stake, 'the significant factor is the harm suffered. [citation

11  omitted].  Absent termination of her employment contract, Takahashi suffered no harm." *Id.* at

12  851.

13         The instant case is distinguishable from *Miller, Wilson,* and *Takahashi,* because the

14  Plaintiff's primary right at stake here is distinct from that in *Grigorescu I.  Grigorescu I* involved

15  whether termination was warranted because the Plaintiff allegedly misrepresented her degree

16  qualifications. The hearing officer found that termination was not warranted because Plaintiff did

17  in fact have a master's degree as she represented, and her employment was reinstated after a brief

18  suspension.  In contrast, the instant case involves Ms. Grigorescu's right to be free of harassment

19  in retaliation for her protected activity; that course of harassment involves an attempt to terminate

20  her along with other harassing actions.  At issue is not a singular right to continued employment

21  (defeating a termination action), but a right to be free from a course of harassing conduct.  Thus,

22  Ms. Grigorescu's alleged civil rights violation does not merely "restate [her] wrongful termination

23  contentions in constitutional terms" because it involves a broader constellation of Defendant's

24  allegedly harassing and retaliatory conduct that spanned several years.  *See Miller,* 39 F.3d at

25  1034-35.  Therefore, Plaintiff has not engaged in unlawful "claim splitting" by asserting herein the

26  failed attempt at termination as part of a larger course of conduct.  Unlike *Takahashi,* the ruling in

27  *Grigorescu I* did not undermine her current claim.  The fact that she prevailed in *Grigorescu I*

28  does not obviate the harm she allegedly suffered.  *C.f. Takahashi,* 783 F.2d at 851.

United States District Court
Northern District of California

United States District Court
Northern District of California

ii.    Collateral Estoppel

Issue preclusion, or collateral estoppel, "precludes relitigation of issues argued and decided in prior proceedings." *Lucido v. Superior Court,* 51 Cal.3d 335, 341 (1990).  There are five requirements.  "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." *Id.* at 341.  As to the first element, the 'identical issue' requirement addresses whether 'identical factual allegations' are *at stake* in the two proceedings … ." *Id.* at 342.  The party asserting collateral estoppel bears the burden of establishing these requirements. *Id.* at 341.

Here, the only issue of possible relevance actually litigated and decided in *Grigorescu I* was whether Ms. Grigorescu misrepresented her attainment of a master's degree.  That issue was resolved in her favor.  It is not an adverse factual finding that can be used against her here.  Collateral estoppel does not preclude her current claim of retaliatory harassment. *C.f. Basurto v. Imperial Irrigation Dist.*, 211 Cal. App. 4th 866 (2012) (adverse finding in administrative proceeding precluded claims later asserted in court).

d.    Conclusion

*Grigorescu I* does not have preclusive effect upon the instant case.  The Court denies Defendant's motion for reconsideration on the issue of preclusion.

3.    Denial of Disability Accommodations

Finally, Defendant asserts as a further basis for reconsideration of the Court's denial of summary judgment the fact that the denial of disability accommodations does not constitute an adverse action.  The "Harassment Actions" include an instance of Defendant's conduct in which Defendant denied her disability accommodations.  Order on MSJ at 15.

a.    Rule 54(b)

As with the interlocutory judgment on preclusion, here too the Court reconsiders this

1    interlocutory judgment under Rule 54(b).[5]

2                        b.    Adverse Action

3        "In a First Amendment retaliation case, an adverse employment action is an act that is

4    reasonably likely to deter employees from engaging in constitutionally protected speech."

5    *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003).  To show this element, courts apply

6    the "reasonably likely to deter" test.  *Greisen v. Hanken,* 925 F.3d 1097, 1113 (9th Cir. 2019). The

7    key question is whether the retaliatory activity "would 'chill or silence a person of ordinary

8    firmness' from continuing to speak out." *Blair v. Bethel Sch. Dist.,* 608 F.3d 540, 543 n.1 (9th

9    Cir. 2010).  Further, "Various kinds of employment actions may have an impermissible chilling

10   effect. Depending on the circumstances, even minor acts of retaliation can infringe on an

11   employee's First Amendment rights."  *Coszalter*, 320 F.3d at 975.

12       Here, the Court previously held that there was a genuine dispute of fact as to whether the

13   "Harassment Actions," when viewed in the aggregate, were adverse actions because "especially

14   when taken together, [they] could be 'reasonably likely to deter' an employee from engaging in

15   protected activity."  Order on MSJ at 15-16.  The Court appropriately included the denial of

16   Plaintiff's disability accommodations within the "Harassment Actions" because the Court may

17   examine the employer's actions in the aggregate when making an adverse action determination.

18   *See Billings v. Town of Grafton,* 515 F.3d 39, 54 n.13 (1st Cir. 2008) ("Retaliatory actions that are

19   not materially adverse when considered individually may collectively amount to a retaliatory

20   environment"); *Martin v. Gates*, no. 07-00513, 2008 U.S. Dist. LEXIS 84481 at *6 (D. Haw. Oct.

21   20, 2008); *Suarez v. Del Toro,* 2022 U.S. Dist. LEXIS 162572 at *20 (S.D. Cal. 2022) (finding

22   that defendants actions in the aggregate, including reassignment of workload, denial of requests

23   for additional training, aggressive actions, and denial of working remotely, constituted "adverse

24   employment actions that detrimentally affected the conditions of Suarez's employment.").  When

25   looking at the "Harassment Actions" in aggregate, the Court finds that the denial of disability

26   accommodations is alleged to be part of a long series of actions which together comprised an

27   ———————————————

28   [5] Even if ruling on this issue were a final judgment, the Court denies the motion for
     reconsideration under Rule 62.1.

United States District Court
Northern District of California

adverse action.  Defendant's citations to *Aki v. Univ. of California Lawrence Berkeley Nat'l Lab'y,* 74 F. Supp. 3d 1163, 1181 (N.D. Cal. 2014), *Doe v. Department of Correction and Rehabilitation*, 43 Cal. App. 5th 721, 735 (2019); and *Christensen v. Washington State Dept. of Corrections*, 2010 WL 1734841 (W.D. Wash. 2010) are all inapposite because those cases did not look at whether the aggregate of actions could constitute an adverse action.[6]  Even if a denial of reasonable accommodations alone did not constitute an adverse action, it still may be sonder along with the other harassing actions to determine whether together they comprise an adverse action.

Therefore, the Court denies Defendant's renewal of its summary judgment motion on the denial of disability accommodations.

### IV.    MOTION FOR JUDGMENT ON THE PLEADINGS

A.    Legal Standard

Rule 12(c) provides, "After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  "Because a Rule 12(c) motion is 'functionally identical' to a Rule 12(b)(6) motion, 'the same standard of review' applies to motions brought under either rule.'" *Gregg v. Hawaii, Dep't of Pub. Safety,* 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)).  Thus, judgment on the pleadings is proper when, "accepting all factual allegations in the complaint as true and drawing 'all reasonable inferences in favor of the nonmoving party,'" the moving party is entitled to judgment as a matter of law.  *Id.* at 886-87 (quoting *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir. 1999)).

B.    Discussion

Defendant argues that Plaintiff fails to allege adverse actions within statute of limitations. In light of the Court's ruling on the motion for summary judgment, only two instances of conduct can form the basis of Plaintiff's First Amendment retaliation claim.  The first is the first termination attempt, *Grigorescu I,* which took place in July 2015.  The second is other retaliatory

---

[6] Furthermore, the issue in *Aki* was not whether the denial of disability accommodations was an adverse action, but rather, whether it had a causal link to his requests for accommodation earlier in the year to be retaliatory.  *See Aki,* 74 F. Supp. 3d at 1181.  It is irrelevant here.

acts, which the Court grouped together as the "Harassment Actions," which took place between 2014 and 2016. The acts from 2014 are as follows:

- A denial of participation in an African American students mentorship program.
- A statement by Dean Frontiera that discussions about alleged discrimination must be "continued in the presence of Eugene Whitlock."
- A ban from substituting for professors
- An incorrect teaching evaluation.

And from 2015:

- A failure to provide workplace disability accommodations, and a requirement that Plaintiff take a leave of absence for medical reasons.

Finally, from 2016:

- A statement by Defendant that Plaintiff recollects as follows: "Whitlock shouted I was a bad employee, who only causes problems, and that he wanted to never hear my name again."
- A denial of teaching assignments throughout the year.
- A denial of a four-day a week work schedule so that Plaintiff could teach at SFSU on Fridays (January 5, 2016).

In response, Plaintiff contends that equitable tolling applies because she was simultaneously pursuing a state court action against Defendant based on the same conduct that forms the bases of her First Amendment retaliation claim.  Opposition at 2-3.

     1.   <u>Procedural validity</u>

As an initial matter, Defendant's motion for judgment on the pleadings is likely procedurally proper because the Court ordered that parties could submit dispositive motions after summary judgment but before trial. Docket No. 103 at 5 (Order Granting Joint Stipulation on Scheduling).  Furthermore, while a motion for judgment on the pleadings ordinarily should be made promptly after the close of pleadings, it is considered timely if it is made early enough to not delay trial or cause prejudice to the non-movant.  Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2004).  The fact that Defendant did not previously raise the statute of limitations in an earlier motion to dismiss does not bar the instant motion in the absence of prejudice.  Here, a 1-week jury trial is set for November 2024 (November 12, 13, 15, 18, 19), and the final pretrial conference is set for October 2024.  Docket No. 103.  Holding the hearing for this motion in March 2024 does not delay the trial which is five months away.  Nor has Plaintiff

United States District Court
Northern District of California

1  shown that the instant motion would be prejudicial at this time.  Therefore, the Court considers the

2  instant motion.

3  Plaintiff again contends here that the trial court is divested of jurisdiction because

4  Defendant filed a notice of appeal to the Ninth Circuit.  For the same reasons stated above for

5  preclusion and denial of disability accommodations, this Court retains jurisdiction because

6  Defendant's motion is independent of its assertion of qualified immunity, and in any event, the

7  Court may act under Rule 62.1.  The Court denies Defendant's motion for the reasons stated

8  below.

9  1.  Statute of Limitations for Section 1983 claim

10  The Ninth Circuit has found that the comparable statute of limitations for § 1983 actions in

11  California is two years.  *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).  Here, Plaintiff filed

12  the initial complaint on September 27, 2018 (Docket No. 1).  Because the statute of limitations is

13  two years, only her claims after September 27, 2016 survive unless equitable tolling applies.

14  "[T]he effect of equitable tolling is that the limitations period stops running during the

15  tolling event, and begins to run again only when the tolling event has concluded. As a

16  consequence, the tolled interval, no matter when it took place, is tacked onto the end of the

17  limitations period, thus extending the deadline for suit by the entire length of time during which

18  the tolling event previously occurred."  *Lantzy v. Centex Homes* 31 Cal.4th 363, 370–371 (2003).

19  "Where a federal claim is not governed by a federal statute of limitations, federal courts "have

20  generally referred to state law for tolling rules, just as we have for the length of statutes of

21  limitations." *Wallace v. Kato*, 549 US 384, 394 (2007).

22  In California, the requirements for equitable tolling are timely notice, lack of prejudice to

23  the defendant, and reasonable and good faith conduct on the part of the plaintiff.  *Addison v. State*

24  *of California,* 21 Cal.3d 313, 319 (1978).  "The timely notice requirement essentially means that

25  the first claim must have been filed within the statutory period. Furthermore the filing of the first

26  claim must alert the defendant in the second claim of the need to begin investigating the facts

27  which form the basis for the second claim. Generally this means that the defendant in the first

28  claim is the same one being sued in the second."  *Collier v. City of Pasadena* 142 Cal. App. 3d

United States District Court
Northern District of California

917, 924 (1983).  "The second prerequisite essentially translates to a requirement that the facts of the two claims be identical or at least so similar that the defendant's investigation of the first claim will put him in a position to fairly defend the second."  *Id.* at 925.  Furthermore, "[c]ourts have adhered to a general policy which favors relieving plaintiff from the bar of a limitations statute when, possessing several legal remedies he, reasonably and in good faith, pursues one designed to lessen the extent of his injuries or damage." *Addison v. State of California,* 21 Cal.3d 313, 317 (1978).

In *Addison v. State,* 21 Cal.3d 313 (1978), the California Supreme Court found that under the doctrine of equitable tolling, the statute of limitations period was suspended while plaintiffs' claims were pending in another tribunal.  *Id.* at 319.  There, the plaintiffs originally timely filed a tort action in federal court. *Id.* at 315.  The federal court declined to assert jurisdiction, without prejudice, and after the statute of limitations period expired, plaintiffs filed an action in state court. *Id.* at 315-16.  The Supreme Court found that equitable tolling applied because the requirements of timely notice, lack of prejudice, and reasonable and good faith conduct on the part of the plaintiff "seemingly are present here."  *Id.*  The Court noted that the same set of facts may be the basis for claims under both federal and state law.  *Id.*  As to good faith conduct, the plaintiff filed his second claim a short time after tolling ended.  *Id.*  The Court also further explained, "We discern no reason of policy which would require plaintiffs to file simultaneously two separate actions based upon the same facts in both state and federal courts since 'duplicative proceedings are surely inefficient, awkward and laborious.'" *Id.*

As in *Addison*, the same set of facts form the basis for Plaintiff's claims in both federal and state court, the prior court denied the claims, and Plaintiff filed the instant federal action after the statute of limitations expired.  Like in *Addison,* here, the limitations are suspended while Plaintiff's claims were pending in state court.  First, Defendants appear to have received timely notice of Plaintiff's claims in state court; they do not claim otherwise.  Plaintiff filed the complaint in state court in 2016, which appears to be within the statute of limitations.  Again, Defendant does not contend otherwise.  Second, Defendant is not prejudiced because the facts alleged in the two suits are nearly identical.  And Defendant received timely notice of the claims. Nothing

suggests Defendant is not in position to fairly defend the instant suit given the sequence of events. Third, it appears that Plaintiff acted in good faith in filing the federal court action because she filed the complaint in 2018, within the same year that the state court denied her writ of mandate, similar to *Addison.* Therefore, the doctrine of equitable tolling applies and the statute of limitations period for her Section 1983 claims was suspended while her claims were pending in state court until 2018.

In sum, Plaintiff is not time-barred from asserting the two adverse actions of the "Harassment Actions" and *Grigorescu I* to form her First Amendment retaliation claim.

## V.   **CONCLUSION**

The Court DENIES Defendant's motion for reconsideration and motion for judgment on the pleadings.

**IT IS SO ORDERED**.

Dated: May 24, 2024

_____
EDWARD M. CHEN
United States District Judge